## Richmond

## ADELARD L. BRAULT, ET AL. v. JOSEPH H. HOLLEMAN, JR., ET AL.

November 24, 1976.

Record No. 761016.

Present, All the Justices.

*Jerry K. Emrich, County Attorney*, for applicants.

*Andrew P. Miller, Attorney General; Anthony F. Troy, Chief Deputy Attorney General; Walter A. McFarlane, Deputy Attorney General; J. Durwood Felton, III, Assistant Attorney General; Valentine W. Southall, Jr., Assistant Attorney General; Debra J. Prillaman, Assistant Attorney General*, for respondents.

CARRICO, J., delivered the opinion of the court.

At its 1976 session, the General Assembly appropriated to the Northern Virginia Transportation Commission, in addition to other specified amounts, a biennial total of $10,000,000 for "State aid for capital costs of Metro Rail." [1] On April 12, 1976, the Governor vetoed the Metro Rail appropriation. This original petition for a writ of mandamus challenges the validity of the veto and presents the question whether the Metro Rail appropriation is an "item" within the meaning of Article V, Section 6 [2] of the Virginia Constitution and thus subject to the Governor's power of veto.

The petitioners for mandamus are Adelard L. Brault, member of the State Senate from Fairfax County, James M. Thomson, member of the House of Delegates from the City of Alexandria, and the County Board of Arlington County. The respondents are Joseph H. Holleman, Jr., Clerk of the House of Delegates and Keeper of the Rolls of the State, John E. Harwood, Commissioner of the Virginia Department of Highways and Transportation, Charles B. Walker, Comptroller of Virginia, and Robert C. Watts, Jr., Treasurer of Virginia. The respondents are the state officials responsible for ministerially implementing release of the Metro Rail funds if the Governor's veto is held invalid.

The designee of the disputed appropriation, the Northern Virginia Transportation Commission, is the governing body of the Northern Virginia Transportation District,[3] composed of the counties of Arlington and Fairfax and the cities of Alexandria, Fairfax, and Falls Church. The Commission coordinates the interests of these localities in the activities of the Washington Metropolitan Area Transit Authority, which was created by a

---

[1] As will be explained *infra*, Metro Rail is part of a mass transit system now under development in the Washington, D.C., area, including several northern Virginia localities.

[2] Article V, Section 6 reads, in pertinent part, as follows:

"The Governor shall have the power to veto any particular item or items of an appropriation bill, but the veto shall not affect the item or items to which he does not object."

[3] Creation of the District was authorized by the Transportation District Act of 1964, Acts 1964, ch. 631, Code §§ 15.1-1342 to -1372.

compact[4] between Virginia, Maryland, and the District of Columbia to develop a mass transit system for a "zone" which includes the northern Virginia communities, the Maryland counties of Montgomery and Prince Georges, and the District of Columbia. The Authority is currently developing the Metro system, consisting of both rail and bus service, with the goal of coordinating all methods of mass transportation in the zone.

Under development by the Authority, and partially in use, is a combination subway and surface rapid rail system, known as Metro Rail, to serve the zone. The Authority has also acquired the private bus companies formerly serving the zone and now operates the facilities as Metro Bus. Gradually, bus lines are being modified to serve areas remote from the rail system and to route passengers to Metro trains. In addition, the Authority is constructing parking lots at rail stations to accommodate passengers who drive their automobiles to the terminals before boarding trains.

The capital cost of development of the Metro system is funded by federal appropriations, proceeds of the sale of revenue bonds, and contributions from the local political subdivisions included within the zone. Pursuant to an agreement executed in 1970, the Virginia subdivisions are obligated to contribute a total of $149,900,000 toward the capital cost of Metro Rail, but escalating costs may require "substantially greater contributions than originally were anticipated."

Although not a party to the 1970 agreement, the Commonwealth has contributed to the development of the Metro system, and the participating northern Virginia localities have received credit for part of the state aid on their obligations to contribute to the capital costs of Metro Rail. The most recent state effort appears in Acts 1976, ch. 779, § 126, Item 826, where a biennial total of $18,000,000 was appropriated for "State aid to regional transportation commissions or local governments from special revenues, in aid of the administration and capital costs of bus transportation, except as otherwise stated." Item 826a contains various amounts appropriated to the Northern Virginia Transportation Commission, including the $10,000,000 biennial total for "State aid for capital costs of Metro Rail," which was

---

[4] See Acts 1966, ch. 2, *amending* Acts 1958, ch. 627.

vetoed by the Governor. The entire appropriation to the Commission and the Governor's veto read as follows:

"*Item 826*

". . . .

"a. Northern Virginia Transportation Commission State aid for administration - - - - - - - - - - $125,000 the first year, $125,000 the second year.

"This appropriation is conditioned upon provision from local sources of three dollars for each State dollar out of the appropriation.

"State aid for capital costs - - - - - - - - - - - - - - - $1,300,000 the first year, $1,300,000 the second year.

"State aid for capital costs of Metro Rail - - - - - - - - - - - - - - - - - $5,000,000 the first year, $5,000,000 the second year.

I veto this item /S/ Mills E. Godwin, Jr. 4/12/76

"Funds for Metro Rail shall be paid by the Northern Virginia Transportation Commission to the Washington Metropolitan Area Transit Authority and be a credit to the Counties of Arlington and Fairfax and the Cities of Alexandria, Fall[s] Church and Fairfax in the same proportion as they are obligated to pay their share of the capital costs of Metro Rail.

"It is provided that, in addition to the appropriation designated in this item for Metro Rail capital costs, payments of $3,500,000 each year heretofore made for aid to mass transit for Northern Virginia Transportation Commission from other items in this act shall be continued."

The appropriation included in Item 826a for "administration" is self-explanatory. The parties agree that the appropriation of $1,300,000 per year for "State aid for capital costs" will serve as "Metro bus capital;" that the $3,500,000 per year required to "be

continued" for "aid to mass transit" is intended for "Metro rail capital for parking facilities;" and that the vetoed appropriation of $5,000,000 per year for "State aid for capital costs of Metro Rail" would have applied to the costs of "hard rail," meaning "the capital costs of constructing the rail system." And, according to its terms, the $5,000,000 per year appropriation was designed to afford credit to the northern Virginia localities on their obligations for the capital costs of Metro Rail.

As has been indicated, note 2 *supra*, Article V, Section 6 of the Virginia Constitution empowers the Governor "to veto any particular item or items of an appropriation bill." The petitioners contend, however, that the disputed Metro Rail appropriation is not an "item" subject to the power of veto under Article V, Section 6. The compact to which Virginia is a party, the petitioners argue, contemplates a "unified regional transit system," consisting of bus service, rail service, and related parking facilities. The General Assembly "thought it well," the petitioners say, to include in Item 826a funds for each element of the system, thereby "tying up" the purpose to be promoted by the appropriation for Metro Rail with the purposes to be promoted by the appropriations for Metro Bus and for parking facilities.

Therefore, the petitioners maintain, the various appropriations for the unified transit system constitute a "single 'item' as that term is used in Article V, Section 6 of the Virginia Constitution." Accordingly, the petitioners assert, the Governor "could not veto the $5,000,000 annual appropriation for Metro rail capital costs without also vetoing the $3,500,000 per year appropriation for Metro rail capital (parking lots), the $1,300,000 per year appropriation for Metro bus capital and the $125,000 per year appropriation for . . . administrative costs."

Furthermore, the petitioners state, the Governor's power of veto does not permit him to reduce the amount of an appropriation or to disapprove an item subject to a condition without also vetoing the condition. Clearly, the petitioners aver, the $5,000,000 per year allotment for Metro Rail capital and the $3,500,000 per year allocation for parking lots are the "same 'item,' " and the veto of the $5,000,000 per year component had the effect of reducing the amount of this item; also the provision relating to the $3,500,000 appropriation is a condition of the $5,000,000 appropriation, yet the condition was not vetoed.

Thus, the petitioners deduce, because the Governor cannot veto part of an item, reduce the amount of an appropriation, or veto a conditional item without also disapproving the condition, the action of the Governor in this case is invalid. From this, the petitioners conclude, it follows that they are entitled to a writ of mandamus directing disbursement of the disputed appropriation.

In *Commonwealth* v. *Dodson*, 176 Va. 281, 11 S.E.2d 120 (1940), we construed the veto provision contained in the Constitution of 1902 (Section 76), which provision is duplicated in the present Constitution (note 2 *supra*). *Dodson* concerned seven vetoes involving the 1940 appropriation bill. This court overturned six of the vetoes and upheld the seventh.

Veto No. 2 in *Dodson* is of interest here. That veto concerned a provision creating and funding the office of Legislative Director in the Division of the Budget. According to the terms of the appropriation bill, the Legislative Director was to cooperate with the Executive Director of the Budget and the State Comptroller in the preparation of the budget and the supervision of expenditures from appropriations made by the General Assembly.

We noted that the "creation of a new office, its holder to serve at a stated salary, without more, would be an 'item' which the Governor at his election might veto, but if it be tied up with other budget provisions, then under the terms of the Constitution it can not be eliminated." 176 Va. at 303, 11 S.E.2d at 130. Because the appropriation for the Legislative Director was so closely "tied up" with appropriations for the Executive Director and the State Comptroller, we held that the provision for the new office did not constitute an "item" subject to the veto power of the Governor.

The parties to the present controversy agree that Veto No. 2 in *Dodson* bears some similarity to the veto involved in this case. Beyond this, however, they depart in their views on the effect of the *Dodson* decision upon this matter. The petitioners believe that, like the appropriation for the Legislative Director in *Dodson*, the $5,000,000 per year appropriation for Metro Rail is so "tied up" with the other appropriations in Item 826a that together they constitute a single item, veto-proof except as a whole. On the other hand, the respondents are of opinion that, unlike the appropriation in *Dodson*, the $5,000,000 per year

appropriation for Metro Rail is a separate, independent item, subject by itself to the power of veto.

*Dodson* enunciated the principles applicable to resolution of a veto dispute. In the constitutional sense, an item of an appropriation bill is an indivisible sum of money dedicated to a stated purpose; the term refers to something which may be eliminated from the bill without affecting the enactment's other purposes or provisions.

While the Governor is empowered to veto any particular item or items of an appropriation bill, he must, for his veto to be valid, strike down the whole of an item; he cannot disapprove part of an item and approve the remainder. And this rule prevents the Governor from reducing the amount of an appropriation which by itself constitutes an item.

Where a condition is attached to an appropriation, the condition must be observed. The Governor cannot veto the appropriation without also disapproving the condition; correspondingly, he cannot veto the condition without also disapproving the appropriation.

With these principles in mind, we return to the petitioners' contentions of invalidity concerning the veto in this case, *viz.*, that the veto affected only part of an item, that the veto had the effect of reducing an appropriation, and that the veto struck down a conditional appropriation without also disapproving the condition. We will consider these contentions in inverse order.

First, we reject the notion, advanced by the petitioners, that the unvetoed $3,500,000 per year provision to "be continued" for "aid to mass transit" for northern Virginia is a condition of the disapproved appropriation of $5,000,000 per year for "State aid for capital costs of Metro Rail." The full $3,500,000 provision reads as follows:

> "It is provided that, in addition to the appropriation designated in this item for Metro Rail capital costs, payments of $3,500,000 each year heretofore made for aid to mass transit for Northern Virginia Transportation Commission from other items in this act shall be continued."

As we understand the petitioners' contention, they claim that the reference in the quoted provision to "other items" is to the other appropriations contained in Item 826a; that continuance of the $3,500,000 per year allocation is a condition,

therefore, of the vetoed $5,000,000 per year appropriation; and that because the condition was not disapproved, the veto is ineffective. But even a casual reading of the quoted provision will disclose that the reference to "other items" is not to other amounts of expenditure but to the sources in the appropriation bill from which the $3,500,000 allocation shall be paid. The only condition attached to the vetoed $5,000,000 per year appropriation is that it be paid to the Washington Metropolitan Area Transit Authority as a credit for the participating northern Virginia localities on their obligations to contribute to the capital costs of Metro Rail. And this condition also was vetoed.

Second, the petitioners' next contention, that the veto had the effect of reducing an appropriation, assumes an important premise: the correctness of their primary contention that all the 1976 appropriations for the Metro system, or at least the combination of the $5,000,000 and $3,500,000 provisions, constitute a single item, subject to veto only as a whole. If the $5,000,000 per year appropriation is an item itself subject to veto, its elimination would not have the allegedly improper effect of reducing an appropriation. Whether the disputed appropriation is such an item is the serious question in the case and the subject of our third and final inquiry.

To determine whether several appropriations relating to the same subject constitute a single item, the petitioners assert that we must "compare the purpose of an appropriation amount that was vetoed with the purpose of an appropriation amount which was not vetoed," and if "the two things are 'tied up' with each other, the veto must fail." Therefore, the petitioners say, the real issue in this case is whether there is "a relationship between bus and rail mass transit in the [northern Virginia] area and between parking facilities at Metro rail stations and Metro rail lines." These relationships are so "considerable," the petitioners state, that elimination of the appropriation for Metro Rail capital would affect seriously the appropriations for bus capital and parking facilities.

We would not question that, in a sense, the purposes to be served by the various appropriations for the Metro system are "tied up" one with the other. After all, the appropriations relate to the same general subject, and they are grouped within the same numbered item. Indeed, it would be difficult to conceive a situation where it could not be said that several appropriations

relating to the same subject were not, at least incidentally, "tied up" together.

Neither would we doubt that, from a practical standpoint, the various segments of the Metro system bear close relationships. Certain of the exhibits filed in this case factually demonstrate the integrated relationship of rail and bus service and parking facilities in the development of the system.

These considerations, however, are not necessarily conclusive. The "tying up" of purposes must be more than incidental; the relationship between purposes must appear intrinsically, rather than extrinsically. The real question, therefore, is whether, from the terms of the appropriation bill itself, several appropriations relating to the same subject are so legally "tied up," are made so legally interdependent, that one cannot be eliminated from the enactment without, in the words of *Dodson*, "affecting its other purposes or provisions." If it is clear from the appropriation bill that, with the disapproved provision eliminated, the approved appropriations cannot effectively serve their intended purposes, the attempted elimination is invalid.

The petitioners concede that we should not be concerned "whether either bus or rail mass transportation in the [northern Virginia] area will grind to a halt without the $5,000,000 per year appropriation which the Governor attempted to veto." We welcome this candid concession; it typifies the sort of extrinsic practical consideration we believe must be excluded in determining whether several appropriations relating to the same subject are legally interdependent. But, at the same time, we would point out that the petitioners' argument concerning the invalidity of the Governor's veto reduces itself to the same sort of proposition: that the single purpose of the General Assembly in adopting Item 826a was to provide a unitary appropriation for an integrated system of mass transportation in northern Virginia, complete with bus service, rail service, and parking facilities. This singularity of purpose, however, does not appear from the terms of the appropriation bill.

The purpose of the $125,000 per year appropriation for "State aid for administration" is obvious. Nothing in Item 826a, however, suggests that this appropriation is dependent upon the vetoed $5,000,000 per year appropriation or upon any other appropriation contained in the item. Neither could it be suggested that the appropriation for administrative costs cannot

effectively serve its intended purpose after elimination of the $5,000,000 per year provision.

The $1,300,000 per year appropriation, although labeled "State aid for capital costs," otherwise is silent as to its purpose. The parties to this controversy represent that this appropriation is intended for "Metro bus capital." The provision concerning continuance of the $3,500,000 per year allocation "for aid to mass transit" likewise is uninformative of its intended purpose. The parties represent that this amount is for "Metro rail capital for parking facilities."

With respect to these two matters, we find ourselves in this position: either we are unable to ascribe meaningful purposes to the $1,300,000 and $3,500,000 amounts or we must accept the representations of the parties, in which latter event separate purposes are revealed. Both courses, however, foreclose the conclusion that either of the two provisions is dependent upon the vetoed $5,000,000 per year appropriation or any other appropriation in Item 826a, or that the two provisions cannot serve their intended purposes, expressed or unexpressed, after elimination of the $5,000,000 appropriation.[5]

In sharp contrast, the purpose of the $5,000,000 per year appropriation clearly is revealed by the terms of the appropriation bill. The disputed appropriation is labeled "State aid for capital costs of Metro Rail," and its primary and real purpose, as expressed by its terms, is to serve as credit for the participating northern Virginia localities against their contractual undertaking to contribute to "the capital costs of Metro Rail." This is a purpose separate and distinct from the purposes of any of the other provisions of Item 826a.

The $5,000,000 per year appropriation is an indivisible sum of money dedicated to a stated purpose. It falls, therefore, within the *Dodson* definition of an "item" in the constitutional sense. And, because its stated purpose is so separate and distinct from anything else in Item 826a, it may be eliminated from the appropriation bill without affecting the enactment's other purposes or provisions. The disputed appropriation, therefore,

---

[5] In oral argument, but not on brief, the petitioners asserted that the words "in addition to" in the $3,500,000 per year provision, quoted previously, establish the relationship necessary to "tie up" this provision with the $5,000,000 per year appropriation. While the words do show some relationship, they are insufficient to establish the legal interdependence necessary to constitute the two provisions a single "item."

satisfies the *Dodson* test of separability. Accordingly, we hold that the Metro Rail appropriation is an "item" within the meaning of Article V, Section 6 of our Constitution, and thus subject to the Governor's power of veto.

For the reasons assigned, the writ of mandamus requested by the petitioners will be denied.

*Writ denied.*