The **COLORADO GENERAL AS-SEMBLY**, Petitioner/Cross–Respondent,

v.

William **OWENS**, in his official capacity as Governor of the State of Colorado; Mike Coffman, in his official capacity as State Treasurer of the State of Colorado; and Leslie Shenefelt, in his official capacity as State Controller for the State of Colorado, Respondents/Cross–Petitioners.

No. 04SC816.

Supreme Court of Colorado, En Banc.

June 12, 2006.

Isaacson Rosenbaum, P.C., Mark G. Grueskin, Edward T. Ramey, Blain D. Myhre, Denver, for Petitioners/Cross–Respondents.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General, Denver, for Respondents/Cross–Petitioners.

Justice EID does not participate.

MULLARKEY, Chief Justice.

## I. Introduction

Because of the great public importance of this dispute between the Governor and the General Assembly, we exercised our authority under C.A.R. 50 to review *Colorado General Assembly v. Owens*, No. 03CV3700 (Denver Dist. Ct. Sept. 29, 2004). This case concerns the Governor's line item vetoes of definitional headnotes in two General Appropriations Bills, also known as the "long" bills, and the Governor's line item veto of an appropriation in a separate substantive bill. The trial court upheld the Governor's line item vetoes in the two long bills, but rejected the Governor's line item veto of the appropriation provision in a substantive bill.

We affirm the judgment of the trial court, although, we differ in part in our analysis. We reject the trial court's conclusion that the long bill headnotes were properly vetoed by the Governor because they are "items" within the meaning of article IV, section 12 of the Colorado Constitution. However, we agree with the court's alternative holding that by adopting the headnotes, the legislature intruded into the executive branch's responsibility to administer the laws and violated the separation of powers doctrine established in article III of our constitution. Likewise, we agree with the ruling below that the Governor cannot veto an appropriation in a substantive bill, unless he vetoes the entire bill.

## II. Facts and Procedural History

This case involves three bills passed by the General Assembly during its 2002 and 2003 sessions and submitted to the Governor for his approval. Two of the bills were the General Appropriations Bills or "long bills" for fiscal years 2002–03, ch. 399, 2002 Colo. Sess. Laws 2659 ("House Bill 02–1420"), and 2003–04, ch. 449, 2003 Colo. Sess. Laws 3143 ("Senate Bill 03–258"). The third bill, House Bill 02–1246, created an Eligible Facilities Education Task Force and made an appropriation to fund it. *See* ch. 242, sec. 3, § 22–2–123, 2002 Colo. Sess. Laws 906, 909.

The first section in each of the long bills sets forth headnotes defining terms such as "capital outlay," "lease space," "operating expenses," and several others. The Governor vetoed fifteen of the definitional headnotes, thirteen of which are at issue here. The headnotes at issue are attached as Appendix A.

In 2002, the General Assembly enacted House Bill 02–1246 entitled "Concerning the Creation of the Eligible Facilities Education Task Force, and Making an Appropriation Therefor." The Governor signed the legislation into law after he vetoed a $10,000 appropriation made in the bill.

The General Assembly, consistent with this court's holding in *Romer v. Colorado General Assembly*, 810 P.2d 215, 225 (Colo.1991), brought an action for declaratory judgment and injunctive relief in the trial court, rather than attempting to override the Governor's veto by a two-thirds majority vote pursuant to article IV, section 11 of the Colorado Constitution. The General Assembly's suit sought a determination that the Governor exceeded his constitutional authority to veto distinct "items" within appropriations bills when he vetoed the thirteen definitional headnotes. An injunction was sought to prevent the state treasurer and controller from taking actions in furtherance of the vetoes. A third claim sought a determination of the validity of the Governor's veto of a $10,000 appropriation contained in House Bill 02–1246.

The Governor counterclaimed for a declaration that the headnote vetoes were valid. The Governor claimed that the headnotes constituted "distinct items" pursuant to the state constitution and intruded upon the powers of the executive branch, or alternatively, that they constituted substantive legislation. The Governor also counterclaimed for a declaration that the Governor had the power to veto an appropriation in either a general appropriations bill or any other bill such as House Bill 02–1246.

Relying on *Colorado General Assembly v. Lamm*, 704 P.2d 1371 (Colo.1985) ("*Lamm*

*II* "), the trial court held that the headnotes were "items" that could appropriately be vetoed by the Governor because the headnote vetoes did not affect the enactment's other purposes. The court held, alternatively, that the headnotes invaded the administrative authority of the executive branch in contravention of the separation of powers doctrine as stated in *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978). Finally, the trial court did not address the Governor's contention that the headnotes were constitutionally invalid as a legislative attempt to enact substantive legislation in the long bills.

With regard to the Governor's line item veto of the $10,000 appropriation in House Bill 02–1246, the trial court invalidated the veto under *Lamm II,* where we held that "[a]ll bills other than general appropriation bills must encompass only a single subject. With the exception of appropriation bills, therefore, the governor must approve or disapprove a bill in its entirety." 704 P.2d at 1383 (citations omitted).

### A. Background

The legislative branch is often described as having the power of the purse. In Colorado, the General Assembly has retained the power to formulate the state's budget. For the past fifty years, the preparation of the budget has been performed by the Joint Budget Committee ("JBC"). *See* ch. 140, sec. 1–8, § 6–2–18, 1959 Colo. Sess. Laws 464, 464–66. The six member JBC has two majority members and one minority member from each house of the General Assembly. § 2–3–201, C.R.S. (2005). The position of JBC chair alternates between the Senate and House members on a yearly basis. *Id.* The JBC employs a professional staff including budget analysts who are assigned to one or more executive agencies and meet with department personnel to review the proposed executive budget. The analysts prepare recommendations for the members of the JBC, and ultimately the committee crafts the budget that is presented to the full legislature and enacted as the long bill. While the executive submits a proposed budget, it is not binding on the legislature.

The JBC employs a technique described as "line item budgeting" to appropriate specific sums of money for specific purposes. *See* Colorado Legislative Council, Recommendations for 1978, Research Pub. No. 223, 1 (1977) (budgeting process described as "legislatively prepared line-item budget system, exerting strong fiscal control through the identification of objects of expenditure in the Long Appropriations Bill"); *see generally* Joe Shoemaker, *Budgeting is the Answer* 45 (1977). Over the years, the state budget has grown in size and complexity. Whereas the budget consisted of thirty typewritten pages in 1955, Shoemaker, *supra,* at 17, the long bill for the current fiscal year is 379 pages in length. *See* ch. 328, 2005 Colo. Sess. Laws 1519, 1519–1874; ch. 349, 2005 Colo. Sess. Laws 1875–1898.

While the General Assembly has great discretion in formulating the budget, it is subject to various constitutional limitations. Relevant to this case are three such restrictions: (1) the Governor's powers to veto items in appropriations bills under article IV, section 12; (2) the prohibition against enacting substantive legislation in the general appropriations bill framed in article V, section 32; and (3) the separation of powers guaranteed by article III.

### B. General Principles

Disputes between the Governor and the General Assembly over the scope of their respective powers occur occasionally because the boundaries between the three branches of government cannot be precisely defined.

> The Colorado Constitution merely states in effect that the legislature cannot exercise executive or judicial power; and that the executive cannot exercise legislative or judicial power .... It does not prescribe exact limits of the respective powers. The dividing lines between the respective powers are often in crepuscular zones, and, therefore, delineation thereof usually should be on a case-by-case basis.

*MacManus v. Love,* 179 Colo. 218, 221, 499 P.2d 609, 610 (1972). When confronted with the type of conflict now before us, the "courts must measure the extent of the Governor's authority to administer by the extent of the

General Assembly's power to appropriate." *Colorado General Assembly v. Lamm*, 700 P.2d 508, 519 (Colo.1985) (*"Lamm I "*).

■ The General Assembly maintains the exclusive authority to enact legislation, including appropriations. The legislature's power over appropriations is plenary, subject only to constitutional limits, and includes the power to attach conditions on expenditures. *MacManus*, 179 Colo. at 221, 499 P.2d at 610; *Anderson*, 195 Colo. at 441, 579 P.2d at 623. A general appropriations bill may only contain appropriations for the expenses of the executive, legislative, and judicial departments of the state, state institutions, interest on the public debt, and public schools. Colo. Const. art. V, § 32. The legislature is prohibited from including substantive legislation in a general appropriations bill. *Id.*

■■ Upon passage of the appropriations bill, the executive's duty to administer the funds begins, subject to the limitations imposed by the legislature. *Anderson*, 195 Colo. at 442, 579 P.2d at 623. However, the legislature "may not attach conditions to a general appropriation bill which purport to reserve to the legislature powers of close supervision that are essentially executive in character." *Id.* at 442, 579 P.2d at 624.

■ The Governor is constitutionally authorized to "disapprove of any item or items of any bill making appropriations of money, embracing distinct items." Colo. Const. art. IV, § 12. This provision allows a veto of any item in its entirety, but does not allow a partial veto. *See Lamm II*, 704 P.2d at 1378. In summary, the item veto is a negative power of limited scope. The Governor may use it to eliminate funding for an item. The veto cannot create funding and it cannot partially reduce funding for an item.

### III. Definitional headnotes and the "item veto" power

■ The General Assembly and the Governor dispute whether headnotes constitute "items" for purposes of the item veto power, and alternatively, whether the headnotes violate the separation of powers or constitute substantive legislation. The validity of the Governor's item veto versus the rationale

behind its exercise is a critical distinction to be made when assessing the claims at issue in this case. *See Anderson*, 195 Colo. at 441, 579 P.2d at 623 (issue was not whether governor properly exercised item veto power, but whether the district court correctly determined that vetoed portions of the long bill were constitutionally invalid). We begin with the former assertion, whether the definitional headnotes in section one of the long bills constitute "items" properly vetoed according to article IV, section 12 of the Colorado Constitution. We hold that they do not.

■ The Colorado Constitution authorizes the Governor to veto "items" within an appropriations bill: "The governor shall have the power to disapprove of any *item or items* of any bill making appropriations of money, embracing *distinct items*, and the part or parts of the bill approved shall be law, and the item or items disapproved shall be void . . . ." Colo. Const. art. IV, § 12 (emphasis added). The limitation of the item veto power to "distinct" items prevents the governor from modifying an item by rejecting only part of it. *Lamm II*, 704 P.2d at 1378; *Stong v. People*, 74 Colo. 283, 292, 220 P. 999, 1003 (1923).

This court first considered the meaning of "item" in *Stong v. People*. In that case, the Governor approved a long bill, but vetoed $1750 from a $7000 salary appropriation for the Industrial Commission secretary. We held that the appropriation for the secretary was a separate, distinct, and indivisible item and that the Governor's veto was invalid because it attempted to strike a portion of the appropriation. *Stong*, 74 Colo. at 292, 220 P. at 1003.

In *Lamm II*, we examined the validity of the Governor's veto of specific source designations for appropriations. We held that the veto was invalid because funding source restrictions were not separate "items" subject to the Governor's item veto power. In that case, we held that an "item" in an appropriations bill must be legally independent, and if removed, it must not affect the bill's purpose or other provisions. *Lamm II*, 704 P.2d at 1384–85.

Arriving at this conclusion, we relied upon a case from the Virginia Supreme Court that construed identical veto language in the Virginia Constitution. *See Brault v. Holleman,* 217 Va. 441, 230 S.E.2d 238, 242 (1976). The *Brault* court defined an "item" as follows: "In the constitutional sense, an item of an appropriation bill is an indivisible sum of money dedicated to a stated purpose; the term refers to something which may be eliminated from the bill without affecting the enactment's other purposes or provisions." *Id.* With regard to the second half of the above-quoted language, the Virginia court elaborated, stating that "[i]f it is clear from the appropriation bill that, with the disapproved provision eliminated, the approved appropriations cannot effectively serve their intended purposes, the attempted elimination is invalid." *Id.* at 244. Based on this language, we concluded in *Lamm II* that "the source of funding is as much a part of an item of appropriation as the amount of money appropriated and the purpose to which it is to be devoted," and so it could not be removed through the item veto power. *Lamm II,* 704 P.2d at 1384.

The Governor contends that the headnotes are "items" subject to the item veto power because they can be removed from the bill without affecting the other purposes or provisions of the general appropriations. The General Assembly argues that the headnotes are not items because eliminating the headnotes removes a portion of the legislature's statement of purpose; thus, the alteration is beyond the constitutional scope of the item veto power. The General Assembly relies on a construction of the term "item" from *Lamm II,* namely that items are " 'indivisible sum[s] of money dedicated to a stated purpose,' " to support their contention that headnotes cannot be items subject to the Governor's veto power. 704 P.2d at 1384 (quoting *Brault,* 230 S.E.2d at 242).

We hold that the definitional headnotes in this case are not "items" for purposes of the item veto power. Headnotes defining the terms used throughout the long bills cannot be "items" because they are not sums of money, and they cannot be eliminated without affecting the other purposes or provisions

of the long bill. Rather, headnotes are "indivisible parts of the items to which they relate," and are "integral to and legally interdependent with other portions of the items of which they are a part." *Id.* at 1385. By striking out the headnotes, the appropriations made throughout the long bills for "operating expenses," "health, life, and dental," and the other line items are necessarily affected.

In the Governor's veto message, he informed the legislature that his agencies will comply with the headnotes to the extent feasible while allowing them to spend outside the parameters set forth in the line item. He also purported to preserve the dollar amount appropriated for each item despite the stricken headnote. The Governor's assumption that the dollar amounts are preserved without condition after his veto is contrary to our analysis in *Lamm II.* The rationale undercutting the Governor's mistaken assumption here was aptly stated by the dissent in that case:

> If the Governor were able to veto an individual item contained within the larger overall appropriation without reducing the overall appropriation by the amount of the vetoed item, the Governor could thereby remove any legislative condition as to how that money could be spent. . . . [T]he effect of such a construction is to vest the Governor with a positive legislative power that is broader than necessary to combat log rolling or other legislative abuse.

704 P.2d at 1391 n. 2 (Quinn, C.J., dissenting). The headnotes function as legislative conditions and so removal of that condition is beyond the Governor's item veto power, especially removal with the expectation that the dollar amount could remain intact. *See also Stong,* 74 Colo. at 292, 220 P. at 1003 (executive cannot veto portion of an item). Based upon these considerations and our precedent, we hold that the headnotes are not "items" subject to the executive's item veto power.

## IV. Separation of Powers

██ We now turn to the Governor's argument that the headnotes violate the separation of powers. The Governor contends that

the vetoes were necessary to allow flexibility in administering the funds within each department. The Governor also claims that the General Assembly's use of headnotes unconstitutionally prevents him from using money from other line items within the same department to meet shortfalls in areas like legal services and utilities. The General Assembly counters that the headnotes enable the legislature to honor its own constitutional obligation to determine and specify the purposes for which it appropriates public funds throughout the state government, while leaving daily administration of the appropriated funds to the executive departments and agencies that receive them. We hold that all thirteen headnotes at issue here, including the full time equivalent; health, life and dental; personal services; short-term disability; lease purchase; leased space; vehicle lease payments; legal services; operating expenses; utilities; purchase of services from computer center; capital outlay; and multiuse network payments headnotes, unconstitutionally intrude on the authority of the executive branch.

▇▇▇▇ Article III of the Colorado Constitution provides that the "powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others." Interpreting this language, we have held that article III permits the General Assembly to limit the cash-fund sources from which appropriated moneys are derived. *Lamm II*, 704 P.2d at 1384–85. However, an appropriations bill cannot interfere with the executive authority to allocate staff and resources, make contracts, enter into agreements, or limit the general administration of the federal funds it receives. The power to appropriate does not give the General Assembly the power of close supervision that is essentially executive in character. *Anderson*, 195 Colo. at 442, 579 P.2d at 623–24.

In carefully striking a balance between the General Assembly's power to appropriate funds and the Governor's power to manage and administer various departments of the executive branch, we have held in prior cases that the following legislative provisions were constitutionally impermissible: conditions on the number of full-time employees in each county; the requirement that the Joint Budget Committee approve rate increases in certain contracts; a provision that made appropriations contingent upon presentation of cost-benefit reports and five year plans to the General Assembly; the funding of full-time employees contingent on case-load; and, the requirement of monthly reports to the budget committee. *See Anderson*, 195 Colo. 437, 579 P.2d 620. We have also held that it would be a legislative infringement on executive power to mandate diversion of limited executive resources to a particular revenue-producing activity. *Lamm II*, 704 P.2d at 1381. And, similarly, it is not within the General Assembly's power to require that "any federal or cash funds received by any agency in excess of the appropriation ... be expended without additional legislative appropriation," because such funds are custodial in nature and not subject to the appropriative power of the legislature. *MacManus*, 179 Colo. at 220, 499 P.2d at 610.

Further, we have distinguished between circumstances in which the General Assembly limits the cash fund sources from which the moneys are to be derived and those in which the "provisions interfered with the administrative utilization of the appropriated funds.... limit[ing] or direct[ing] the executive in putting the moneys to use." *Lamm II*, 704 P.2d at 1380. In sum, the legislature may not "limit the executive branch in its staffing, resource allocation, or general administration of the federal funds it receives." *Anderson*, 195 Colo. at 444, 579 P.2d at 625.

With these principles in mind, we now turn to the headnotes vetoed by the Governor and asserted to be a violation of the separation of powers. We first address the "full time equivalent" or "FTE" headnote applicable to executive branch employees that defines an FTE as "the budgetary equivalent of one permanent position continuously filled full-

time for an entire fiscal year."[1] That same headnote asserts that "[t]he maximum limitation on the number of FTE that are allowed for the fiscal year to which this act pertains may comprise any combination of part-time positions or full-time positions so long as the maximum FTE limitation is not exceeded." The FTE definition, in combination with the numerical limits on FTE in individual appropriations, is designed to limit the actual number of FTE that an agency may hire. For instance, in House Bill 02–1420, the appropriation for the Department of Human Services contains a breakdown of expenses for each function within that department such as the Division of Child Welfare, and designates the number of FTE allowed in each category, such as 29.0 FTE in the administration section of the Division, and 2.0 FTE in the Families Program section of the Division. *See* ch. 399, 2002 Colo. Sess. Laws 2659, 2780.

Under our holding in *Anderson*, the General Assembly may not designate the number of full-time employees as such a condition "interfere[s] with the executive authority to allocate staff and resources in administering the funds." 195 Colo. at 446, 579 P.2d at 626. We do not read *Anderson* as narrowly as the General Assembly advocates;[2] rather, we hold that *Anderson* stands for the proposition that a limit on the number of FTEs constitutes interference with the inherent prerogatives of the executive branch.

According to the Governor, the headnotes for health, life, and dental; personal services; and short-term disability violate the separation of powers due to the prohibition on interference with the executive authority to allocate staff and resources in administering funds.[3] The Governor argues that these three headnotes are inextricably related to the remuneration packages to which each employee is entitled. By dividing the payment of salaries and benefits into three

parts, the Governor contends that the General Assembly effectively limits the number of employees that can be hired, especially by utilizing language preventing the expenditure of these funds for any other purpose. This mechanism for limiting the number of employees an agency may hire is similar to the FTE headnote at issue in *Anderson* that directly limited the number of full-time employees hired in each department, interfering with the authority of the executive to allocate staff and resources, and is likewise invalid. *See Anderson*, 195 Colo. at 446, 579 P.2d at 626.

The Governor contends that the headnotes defining capital outlay; operating expenses; lease purchase; leased space; legal services; purchase of services from the computer center; utilities; vehicle lease payments; and multiuse network payments all intrude on the authority of the executive. According to the Governor's position, he vetoed each of these headnotes because the departments risked a shortfall of funds otherwise, impacting services to citizens, and the executive agencies would have to resort to seeking supplemental funds from the legislature. The Governor seeks approval of these vetoes to allow "flexibility for the use of funds appropriated within the individual departments." The "flexibility" sought by the Governor is integral to his argument that the use of headnotes prevents the executive from moving funds between accounts within departments, violating the separation of powers.

The General Assembly counters that striking the definitional headnotes effectively reappropriates funds within a department for purposes other than those for which the legislature had appropriated them. Permitting the Governor the flexibility he seeks, the legislature argues, weakens the legislature's plenary authority and its ability to meet its constitutional responsibility to consider and balance competing interests and needs across

---

1. All headnotes cited in this discussion can be read in their entirety at Appendix A.

2. The General Assembly attempts to distinguish *Anderson* by asserting that "nothing in the definition nor its line item applications approaches the level of detail (specification of job position and county of assignment) found objectionable by this court in *Anderson*." As our discussion explains,

this attempt to distinguish *Anderson* is unpersuasive when one actually reads the headnotes in concert with the line items.

3. The full text of the Governor's veto message regarding each headnote is available at Appendix B.

the entire state government. The General Assembly also emphasizes the existence of a variety of mechanisms to address unforeseen circumstances and budget shortfalls. These mechanisms include regular, early, late, and emergency supplemental appropriations available in one form or another throughout the year; the Governor's discretionary intradepartmental transfer authority pursuant to section 24–75–108, C.R.S. (2005);[4] each department's over-expenditure authority as provided by section 24–75–109, C.R.S. (2005);[5] the Governor's disaster emergency funds as authorized by section 24–32–2106, C.R.S. (2005);[6] and, in extraordinary circumstances, the Governor's constitutional authority to call a special session of the legislature.

The precise extent to which an appropriation may be itemized is not prescribed by the constitution, and it has not been explored in great detail by this court. While the legislature certainly maintains the power to appropriate and attach various purposes and conditions to an appropriation, it cannot interfere with the administration of the funds either explicitly or implicitly by using creative language and mechanisms in the long bill that would thwart the exercise of legitimate executive authority. An overview of each headnote and its practical effect on the day-to-day operations of the executive branch is necessary to determine whether each headnote intrudes on the executive power, or falls within the ambit of the legislature.

The trial testimony best illustrates the function of the headnotes in relation to the administration of the budget. Nancy McCallin, then director of the Office of State Planning and Budgeting, testified that the executive branch was not seeking the ability to make intradepartmental transfers[7] and its expressed need for "flexibility" was not an affront to the legislative purpose for appropriations. Rather, she testified that the executive branch requires the ability to manage its budget to meet regularly occurring shortfalls within a single department for items like utilities and legal services. For instance, McCallin testified that by eliminating the headnote for vehicle lease payments, specifically the language stating that "[n]o funds shall be expended for vehicle lease payments except those specifically appropriated for such purposes," the Governor can effectively manage unforeseen issues such as the rising price of leasing vehicles for various departments. The veto permits agency heads to spend money from the operating expenses line to meet a vehicle lease payment shortfall. This expenditure is not an intradepartmental transfer because money from the operating expenses line could only be applied to vehicle lease payments if excess funds existed, and only to pay the difference between the appropriation and the actual expense incurred.

McCallin further testified that budgeting flexibility is allowed under the General Accounting Standards Board ("GASB") definitions for items like operating expenses and personal services that include vehicle lease payments and legal services as subcategories. The GASB standards were adopted by statute, currently codified at section 24–30–202(12), C.R.S. (2005), and provide that the controller must install a unified and integrated system of accounts based on those standards. The headnotes for operating expenses and personal services are roughly based on the GASB definitions, although they are more restrictive.

Another witness, Leslie Shenefelt, the Colorado State Controller during the litigation, testified to the effect of the headnotes on

---

4. The section, entitled "Intradepartmental transfers between appropriations," provides that the Governor or the head of a principle department may, on or after May 1 of the fiscal year and before the forty-fifth day after the close of the fiscal year, "transfer moneys from one item of appropriation made to the principal department in the general appropriation act to another item of appropriation made to the same principal department in said act; except that such transfers shall be made only between appropriations for like purposes." § 24–75–108, C.R.S. (2005).

5. This section provides that the controller may allow expenditures in excess of appropriations in certain circumstances.

6. This section expresses the policy that state funds will be made available to meet disaster emergencies.

7. *See supra* note 4.

fulfilling the mandate in section 24–30–202(12) to prescribe and install a unified and integrated system of accounts for the state based on the GASB standards. Shenefelt described how the headnote definitions are in conflict with generally accepted accounting principles, with which he is statutorily mandated to comply. For instance, Shenefelt explained that for accounting purposes, health, life, and dental expenses would normally fall under personal services as a subcategory, and that the headnote breaks this expense out of that line item in contravention of the accounting principles. Shenefelt testified that under the GASB standards, accounts are paid according to the type of item or service purchased and how that item or service will be used rather than by a specific definition. Significantly, he stated that the Governor's vetoes neutralized the conflicts between the headnotes and the GASB standards.

The testimony shows that the primary difficulty with some of the headnotes—specifically health, life, and dental; multiuse network payments; and short term disability—is restrictive language preventing the executive from spending excess funds from these line items to meet shortfalls elsewhere within an individual department's budget. The language states that "[n]o funds appropriated for health, life, and dental shall be expended for any other purpose." The effect is that any excess funds existing within these items must be returned to the legislature and cannot be used to meet normally occurring shortfalls in other intradepartmental line items. Similarly, the headnotes for lease purchase, leased space, legal services, and vehicle lease payments prohibit expenditures for these items outside the specific appropriation, although such expenditures could be made from the personal services or operating expenses line under the GASB standards.

By dividing the executive's ability to pool resources already appropriated to it, the General Assembly is supervising the executive's allocation and administration of those resources in contravention of our decision in *Anderson* where we prohibited the General Assembly's condition of appropriations on the presentation of periodic expense reports. In

*Anderson*, we relied upon a decision from Massachusetts, *In re Opinion of the Justices to the Governor*, 369 Mass. 990, 341 N.E.2d 254 (1976), to illustrate the problem of the legislature exercising the powers of close supervision belonging to the executive. *Anderson*, 195 Colo. at 442, 579 P.2d at 624. The Massachusetts court rejected the legislature's attempt to require the executive to hold open state-funded jobs which became vacant during the year until two committees of the legislature verified that a "critical need" to fill them existed. That court reasoned that "the power to determine whether a critical need exists is an executive power to be exercised over the expenditure of appropriated funds, and not one encompassed within the legislative power of appropriation." *Id.* at 442, 579 P.2d at 624 (explaining the holding in *In re Opinion of the Justices* ). Our holding in *Anderson* emphasizes that to fulfill the state constitutional mandate to execute the laws, "the executive has the authority to administer the funds appropriated by the legislature for programs enacted by the legislature," and should do so unencumbered by supervisory type requirements. *Id.* at 442, 579 P.2d at 623. The headnotes for health, life, and dental; multiuse network payments; vehicle leases; short term disability; leased space; lease purchase; and legal services deprive the executive of the ability to allocate resources to pay for outstanding expenditures without first obtaining approval from the legislature to use funds from lines already appropriated. The headnotes thus, violate the separation of powers. Further, the operating expenses headnote contains a prohibition from covering outstanding charges for vehicle lease payments, leased space, and lease purchases. This explicit prohibition is also unconstitutional because it is intertwined with the individual headnotes that limit the executive to a degree that amounts to legislative supervision.

It is important to note that what the executive seeks to do is not the same as an intradepartmental transfer or increase in appropriation for any department. The Governor seeks to balance the budget by paying for outstanding debts using moneys from items already appropriated to each department, albeit the items as defined by the

GASB standards, not the narrow definitions contained in the headnotes. The reach of the legislature's headnotes is limited to the extent that the headnotes prohibit the executive from exercising control over management decisions. The line items and headnotes at issue here require that the executive make a showing to the legislative branch to determine when the executive's departmental needs are critical enough to authorize the use of funds already appropriated. Requiring such a showing violates the separation of powers.

The use of headnotes as a method to control and closely manage the executive branch becomes clear when one compares the executive and legislative budgets. In appropriating moneys for its own function, the General Assembly does not include any headnotes and confines the budget to five appropriations, one for each house, the state auditor, the JBC, the legislative council, and committee on legal services, respectively. *See* ch. 426, sec. 1, 2003 Colo. Sess. Laws 2697 (Senate appropriation for the legislative department); ch. 353, sec. 1, 2002 Colo. Sess. Laws 1961 (house appropriation for the legislative department). The lack of extensive headnotes is explained by the fact that the legislative budget is subject to ongoing management by the General Assembly, and so the headnotes are unnecessary.

The remaining headnotes at issue in this case—utilities, capital outlay, and purchase of services from computer center—do not contain the prohibitive language found in the other headnotes that we find unconstitutional. However, the utilities, and computer services headnotes are both affected by the definition of operating expenses. The headnote for operating expenses, specifically subpart (b),[8] contains language indicating that if the legislature creates a separate line of appropriation for a type of charge or service such as utilities, the executive is not allowed to pay for that charge or service from the operating expenses line. The legislature has not only narrowed the definition of operating expenses as used by the state controller in

compliance with the GASB standards, but it has decided that paying for such essential services is subject to legislative approval. By separating these specific charges out from the operating expenses item, the legislature is managing the day-to-day operations of the departments which need these services to remain operational. While the legislature interprets these headnotes as conditions and expressions of legislative purpose, it fails to explain why it is the appropriate branch to oversee the minutiae of state government, including whether such departments can pay their monthly utility bills in a dramatically fluctuating energy market. These headnotes do not operate to further any legislative purpose for funding particular programs, but instead operate to exercise unconstitutionally close supervision over every department. Based upon the foregoing analysis, the headnotes for utilities and purchase of services from computer center are unconstitutional.

The headnote for capital outlay, like the headnotes defining utilities and purchase from computer services, lacks any unconstitutionally prohibitive language. The headnote not only defines purchases that qualify as "capital outlay," but also places specific monetary caps on the purchase of equipment, building repairs, renovations, and improvements to property: "Capital outlay means: (I) Equipment, furniture, motor vehicles, software, and other items that have a useful life of one year or more and that cost less than fifty thousand dollars." This monetary restriction is in addition to the actual amount of money appropriated for this item in the long bill for each department.

The legislature argues that the monetary caps are appropriate conditions on the appropriation for capital outlay. The executive counters that the monetary caps inhibit the ability of the Governor to decide how best to operate each agency. Once again, the trial testimony helps illuminate the ramifications of adding a monetary cap to various purchases in the headnote. McCallin testified that the headnote is much more restrictive than the GASB definition, and prevents exec-

---

**8.** "[c]urrent charges, meaning charges for items or services not otherwise defined in this section for which a separate appropriation is not made, including, but not limited to, charges for utilities, trash removal, [etc.] ...."

utive agencies from purchasing equipment or making repairs that facilitate productivity and essential departmental operations.

Apart from the testimony, it is evident from the language of the headnote that the specific limitations for various purchases cannot be altered, even with a transfer or additional appropriation. The net effect of the monetary caps is that no matter how much money is appropriated for the capital outlay line, every department is prevented from purchasing equipment or making repairs that exceed an artificially designated amount of money, even through utilization of the transfer power or the supplementary appropriation process. The General Assembly has the ability to limit the amount appropriated for each line item if it wishes to curtail expenditures for items like capital outlay, but it does not have the power to force the executive to halt its various departmental operations because of an inability to repair heating and ventilation, or to purchase necessary equipment by placing monetary caps in the headnote. The headnote impermissibly encroaches on the Governor's ability to allocate resources to operate statutorily authorized programs, and violates the separation of powers.

For these reasons, the headnotes defining full time equivalent; health, life and dental; personal services; short-term disability; lease purchase; leased space; vehicle lease payments; legal services; operating expenses; utilities; capital outlay; purchase of services from computer center; and multiuse network payments unconstitutionally infringe on the Governor's resource allocation and general administrative powers.[9] *See Anderson,* 195 Colo. at 445–46, 579 P.2d at 625–26.

## V. The "item veto" power and bills other than the general appropriations bills

█ We finally turn to the issue of the Governor's item veto power over bills other than the general appropriations bills. The legislature enacted House Bill 02–1246 titled

"Concerning the Creation of the Eligible Facilities Education Task Force, and Making an Appropriation Therefor." The Governor vetoed a $10,000 appropriation to compensate members of the legislature who served on the task force. The Governor contends he has the power to disapprove of any appropriations provision of any bill, including a substantive bill. The General Assembly submits the item veto power extends only to general appropriations bills rendering the Governor's attempted veto of the appropriation in House Bill 02–1246 invalid because it is a substantive bill subject only to the full veto power of article IV, section 11 of the state constitution. We agree with the legislature that an appropriation in a substantive bill does not make that bill an appropriations bill subject to the item veto power.

As we explained in *Lamm II,* "[a]ll bills other than general appropriations bills must encompass only a single subject." 704 P.2d at 1383; Colo. Const. art. V, § 21 (bills must contain only one subject except general appropriations bills). The bifurcation of single subject requirements for substantive bills and multi-subject allowance for long bills is properly reflected in the two types of veto power maintained by the Governor. Article IV, section 11 requires the Governor to veto a bill in its entirety. *See also Lamm II,* 704 P.2d at 1383. The item veto power enables the Governor to veto "distinct items" of any bill making appropriations. Colo. Const. art. IV, § 12; *see also Lamm II,* 704 P.2d at 1383 ("With the exception of appropriation bills, therefore, the governor must approve or disapprove a bill in its entirety.").

To interpret the presence of an appropriation clause in a substantive bill as an "appropriations bill" subject to the item veto power would render the distinction between the two veto powers nugatory. The Governor's interpretation would require this court to ignore the plain language of the item veto power that applies only to bills containing multiple appropriations and embracing distinct items.

---

9.  Because we address all of the headnotes under our separation of powers analysis, we do not reach the question of whether the headnotes violate the prohibition against substantive legislation in a long bill.

Colo. Const. art. IV, § 12.[10]

■ The item veto power does not apply to any appropriation in any bill; rather, it applies only to those bills that have the "primary purpose" of making appropriations. *See* Colo. Const. art. V, § 32 ("The general appropriation bill shall embrace nothing but appropriations for the expense of the executive, legislative and judicial departments ...."). In Colorado, the long bills are the only type of legislation with that purpose. *See also Bengzon v. Sec'y of Justice of the Philippine Islands,* 299 U.S. 410, 413, 57 S.Ct. 252, 81 L.Ed. 312 (1937) (employing primary purpose analysis and holding that a substantive bill with an appropriation is not an appropriations bill qualifying for the item veto power). This interpretation is consistent with the plain language of the item veto provision because that power may only touch upon bills containing several "distinct items," rather than single subject bills like House Bill 02–1246. *See Perry v. Decker,* 457 A.2d 357, 360 (Del.1983).

We hold that House Bill 02–1246 is a single subject substantive bill that creates and partially funds a new program, the Education Task Force, and is not a bill "fund[ing] programs that have been separately authorized by other legislation." *Lamm II,* 704 P.2d at 1382. As such, the Governor's item veto of the appropriation made therein is invalid.

## VI. Conclusion

Although the headnotes in the long bills are not items that may be vetoed under the executive's line item veto power, the thirteen headnotes at issue violate the constitutionally required separation of powers. Accordingly, we hold unconstitutional the headnotes defining full-time equivalent; health, life, and dental; personal services; short-term disability; lease purchase; leased space; legal services; operating expenses; vehicle lease payments; multiuse network payments; utilities; capital outlay; and purchase of services from com-

puter center. In addition, we uphold the trial court's decision invalidating the Governor's veto of a $10,000 appropriation in a substantive bill creating an education task force. The judgment of the trial court is affirmed.

## Appendix A

The headnotes at issue from the two long bills are identical. The headnotes are reproduced here for convenient reference, and are taken from House Bill 02–1420 with their respective subsection numbers.

(1)(a) "Capital outlay" means:

(I) Equipment, furniture, motor vehicles, software, and other items that have a useful life of one year or more and that cost less than fifty thousand dollars;

(II) Alterations and replacements, meaning major and extensive repair, remodeling, or alteration of buildings, the replacement thereof, or the replacement and renewal of the plumbing, wiring, electrical, fiber optic, heating, and air conditioning systems therein, costing less than fifteen thousand dollars;

(III) New Structures, meaning the construction of entirely new buildings where the cost will be less than fifteen thousand dollars, including the value of materials and labor, either state supplied or supplied by contract;

(IV) Nonstructural improvements to land; meaning the grading, leveling, drainage, irrigation, and landscaping thereof and the construction of roadways, fences, ditches, and sanitary and storm sewers, where the cost will be less than five thousand dollars.

(b) "Capital outlay" does not include those things defined as capital construction by section 24–75–301, Colorado Revised Statutes.

*       *       *

(3)(a)(I) Except as otherwise provided in paragraph (b) of this subsection, "full time equivalent" or "FTE" means the budgetary equivalent of one permanent position continuously filled full time for an entire fiscal year

---

10. When faced with a similar question, the Delaware Supreme Court stated, "[o]nly bills containing more than one 'distinct' item of appropriation of money meet the language of [the item veto provision]." *Perry v. Decker,* 457 A.2d 357, 360 (Del.1983). Delaware's item veto provision is identical to Colorado's. The *Perry* court concluded that Delaware's "line-item veto provision ... must be limited to bills which contain 'distinct items' of appropriation and may not be applied to bills which contain only a single item of appropriation." *Id.* (emphasis added).

by elected state officials or by state employees who are paid for at least two thousand eighty hours per fiscal year, with adjustments made to:

(A) Include in such time computation any sick, annual, administrative, or other paid leave; and

(B) Exclude from such time computation any overtime or shift differential payments made in excess of regular or normal hours worked and any leave payouts upon termination of employment.

(II) "Full time equivalent" or "FTE" does not include contractual, temporary, or permanent seasonal positions.

(III) As used in this paragraph (a), "State employee" means a person employed by the state, whether or not such person is a classified employee in the state personnel system.

(b) For purposes of higher education professional personnel and assistants in resident instruction and professional personnel in organized research and activities relating to instruction, "full time equivalent" or "FTE" means the equivalent of one permanent position continuously filled for a nine-month or ten-month academic year.

(c) The maximum limitation on the number of FTE that are allowed for the fiscal year to which this act pertains may comprise any combination of part-time positions or full-time positions so long as the maximum FTE limitation is not exceeded.

(4) "Health, life, and dental," means the state contribution to employee health, life, and dental insurance pursuant to section 24–50–609, Colorado Revised Statutes. No funds appropriated for health, life, and dental shall be expended for any other purpose.

* * *

(6) "Lease purchase" means the use and acquisition of equipment under an agreement to purchase, pursuant to which payments are made for a period of longer than one year and are subject to annual appropriation. "Lease purchase" may also include payments made under the agreement for the maintenance of the equipment. No funds shall be expended for lease purchases except those specifically appropriated for such purpose. The provisions of this subsection (6) shall not apply to the board of regents of the university of Colorado; the state board of agriculture; the board of trustees of the Colorado school of mines; the board of trustees of the university of northern Colorado; the trustees of the state colleges in Colorado; the state board for community colleges and occupational education (except for administration and the division of occupational education); the board for the Auraria higher education center; the state historical society; the Colorado council on the arts; the division of wildlife; the water conservation board; the county departments of social services; and the low income energy assistance block grant.

(7) "Leased space" means the use and acquisition of office facilities and office and parking space pursuant to a rental agreement. No funds shall be expended for leased space except pursuant to a specific appropriation for such purpose. The provisions of this subsection (7) shall not apply to the board of regents of the university of Colorado; the state board of agriculture; the board of trustees of the Colorado school of mines; the board of trustees of the university of northern Colorado; the trustees of the state colleges in Colorado; the state board for community colleges and occupational education (except for administration and the division of occupational education); the board for the Auraria higher education center; the state historical society; the Colorado council on the arts; the division of wildlife; the water conservation board; the county departments of social services; and the low income energy assistance block grant.

(8) "Legal services" means the purchase of legal services from the department of law; however, up to ten percent of the amount appropriated for legal services may instead be expended for operating expenses, contractual services, and tuition for employee training. No funds shall be expended for legal services except those specifically appropriated for such purpose. The provision of this subsection (8) shall not apply to the departments of education, higher education, trans-

portation, and the risk management fund in the department of personnel.

\* \* \*

(10) "Operating expenses" means:

(a) Supplies and materials, meaning items that by their nature are consumable and that have a useful life of less than one year or that, after usage, undergo an impairment of, or a material change in, physical condition, including, but not limited to, books, periodicals, and educational, laboratory, medical, data processing, custodial, postal, office, photographic, and road maintenance supplies and materials;

(b) Current charges, meaning charges for items or services not otherwise defined in this section for which a separate appropriation is not made, including, but not limited to, charges for utilities, trash removal, custodial services, telecommunications, data processing, advertising, freight, rentals of equipment and property, storage, parking, minor repair or maintenance, and printing and reproduction, and insurance premiums, dues, subscriptions, casualty losses, commissions, royalties, interest, fees, fines, reimbursements, and payments of prizes, awards, and judgments other than to state employees as compensation; except that no funds appropriated for operating expenses may be expended for vehicle lease payments, leased space, or lease purchase unless otherwise authorized by law;

(c) Capital outlay, as defined in subsection (1) of this section,

(d) The cost of travel by common carrier or by state-owned or privately owned conveyance and the costs of meals and lodging incident to such travel.

(11) "Personal services" means:

(a) All salaries and wages, whether to full-time, part-time, or temporary employees of the state, and also includes the state's contribution to the public employee's retirement fund and the state's share of federal Medicare tax paid for state employees. Payments for overtime shall be in compliance with rules and procedures adopted by the state personnel director.

(b) Professional services, meaning services requiring advanced study in a specialized discipline that are rendered or performed by firms or individuals for the state other than for employment compensation as an employee of the state, including, but not limited to accounting, consulting, architectural, engineering, physician, nurse, specialized computer, and construction management services. Payments for professional services shall be in compliance with section 24–30–202(2) and (3), Colorado Revised Statutes.

(c) Temporary services, meaning clerical, administrative, and casual labor rendered or performed by firms or individuals for the state other than for employment compensation as an employee of the state. Payments for temporary services shall be in compliance with section 24–30–202(2) and (3), Colorado Revised Statutes.

(d) Tuition, meaning payments for graduate or undergraduate courses taken by state employees at institutions of higher education.

(e) Payments for unemployment insurance as required by the department of labor and employment.

(12) "Purchase of services from computer center" means the purchase of automated data processing services from the general government computer center.

(13) "Short term disability" means the state contribution for employee short term disability pursuant to section 24–50–603, Colorado Revised Statutes. No funds appropriated for short term disability shall be expended for any other purpose.

(14) "Utilities" means water, sewer service, electricity, payments to energy service companies, purchase of energy conservation equipment, and all heating fuels.

(15) "Vehicle lease payments" means the annual payments to the department of personnel for the cost of administration, repayment of a loan from the state treasury, and lease purchase payments for new and replacement vehicles. No funds shall be expended for vehicle lease payments except those specifically appropriated for such purposes. The provisions of this subsection (15) shall not apply to the departments of education, higher education, and transportation.

(16) "Multiuse Network Payments" means payments to the Department of Personnel for the cost of administration and the use of the state's telecommunications network. No funds appropriated for multiuse network payments shall be expended for any other purpose.

Appendix B

Excerpts from the executive veto message below follow the order of each headnote as they appear in House Bill 02–1420.

1. *"Capital outlay"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. In addition, capital funding for FY 2001–02 has been significantly reduced. Revenues have been decreasing and since October 2001, I have ordered restrictions on General Fund spending. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. Furthermore, the dollar amounts listed in this headnote have not been changed since 1977. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

2. *"Full Time Equivalent"*—I vetoed this headnote last year. The Colorado Supreme Court concluded in 1978 that legislative attempts to administer the appropriation by placing "specific staffing and resource allocation decisions" in a general appropriations bill were unconstitutional. *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978). The Supreme Court in so doing recognized that the ability to make staffing decisions is one of the most fundamental components of managing state government. Therefore, this headnote and its references are constitutionally void. Although I generally agree with the definition of the FTE, such a headnote inhibits the executive branch's authority to administer the appropriation and is thus unconstitutional.

3. *"Health, life, and dental"*—The state has experienced four consecutive years of reductions in personal services. In addition, revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

4. *"Lease purchase"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

5. *"Leased space"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

6. *"Legal services"*—I vetoed this headnote last year. Legal services expenditures are not discretionary in protecting the interest of the state and its citizens. Limiting the department's ability to expend funds for these services would result in ineffective administration of the government. However, I recognize the need to contain state expenditures for legal services. I will instruct departments to use all necessary restraint in legal service expenditures and to provide an accurate annual accounting of all legal expenditures to the Joint Budget Committee.

7. *"Operating Expenses"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

8. *"Personal services"*—The state has experienced four consecutive years of reductions in personal services. In addition, revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

9. *"Purchase of services from computer center"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

10. *"Short term disability"*—The state has experienced four consecutive years of reductions in personal services. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

11. *"Utilities"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

12. *"Vehicle lease payments"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund

spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.

13. *"Multiuse network payments"*—The state has experienced significant reductions in personal services and operating budgets during the last four years. Revenues have been decreasing and I have ordered restrictions on General Fund spending since October 2001. In order to provide flexibility for departments so that impacts on services to citizens are minimized, I am vetoing this headnote. I will direct the departments to comply with this headnote to the extent feasible. However, to the extent that this headnote might hinder the ability of departments to meet the needs of citizens, they will be allowed to spend outside of these parameters.