Anthony LOBATO, as an individual and as parent and natural guardian of Taylor Lobato and Alexa Lobato; Denise Lobato, as an individual and as parent and natural guardian of Taylor Lobato and Alexa Lobato; Jaime Hurtado and Coralee Hurtado, as individuals and as parents and natural guardians of Maria Hurtado and Evan Hurtado; Janet L. Kuntz, as an individual and as parent and natural guardian of Daniel Kuntz and Stacey Kuntz; Pantaleón Villagomez and Maria Villagomez, as individuals and as parents and natural guardians of Chris Villagomez, Monique Villagomez and Angel Villagomez; Linda Warsh, as an individual and as parent and natural guardian of Adam Warsh, Karen Warsh and Ashley Warsh; Elaine Gerdin, as an individual and as parent and natural guardian of N.T., J.G. and N.G.; Dawn Hartung, as an individual and as parent and natural guardian of Q.H.; Paul Lastrella, as an individual and as parent and natural guardian of B.L.; Woodrow Longmire, as an individual and as parent and natural guardian of Tianna Longmire; Steve Seibert and Dana Seibert, as individuals and as parents and natural guardians of Rebecca Seibert and Andrew Seibert; Olivia Wright, as an individual and as parent and natural guardian of A.E. and M.E.; Herbert Conboy and Victoria Conboy, as individuals and as parents and natural guardians of Tabitha Conboy and Timothy Conboy; Terry Hart, as an individual and as parent and natural guardian of Katherine Hart; Larry Howe–Kerr and Kathy Howe–Kerr, as individuals and as parents and natural guardians of Lauren Howe–Kerr and Luke Howe–Kerr; John T. Lane, as an individual; Jennifer Pate, as an individual and as parent and natural guardian of Ethan Pate and Evelyn Pate; Robert L. Podio and Blanche J. Podio, as individuals and as parents and natural guardians of Robert Podio and Samantha Podio; Tami Quandt, as an individual and as parent and natural guardian of Brianna Quandt, Cody Quandt and Levi Quandt; Brenda Christian, as an individual and as parent and natural guardian of Ryan Christian; Toni L. McPeek, as an individual and as parent and natural guardian of M.J. McPeek, Cassie McPeek and Michael McPeek; Christine Tiemann, as an individual and as parent and natural guardian of Emily Tiemann and Zachary Tiemann; Paula VanBeek, as an individual and as parent and natural guardian of Kara Van-Beek and Antonius VanBeek; Larry Haller and Pennie Haller, as individuals and as parents and natural guardians of Kelly Haller and Brandy Haller; Tim Hunt and Sabrina Hunt, as individuals and as parents and natural guardians of Shannon Moore–Hiner, Eris Moore, Darean Hunt and Jeffrey Hunt; Mike McCaleb and Julie McCaleb, as individuals and as parents and natural guardians of Rebekka McCaleb, Layne McCaleb and Lynde McCaleb; Todd Thompson and Judy Thompson, as individuals and as parents and natural guardians of Garson Thompson and Tarek Thompson; Doug Vondy and Denise Vondy, as individuals and as parents and natural guardians of Kyle Leaf and Hannah Vondy; Brad Weisensee and Traci Weisensee, as individuals and as parents and natural guardians of Joseph Weisensee, Anna Weisensee, Amy Weisensee and Elijah Weisensee; Stephen Topping, as an individual and as parent and natural guardian of Michael Topping; Donna Wilson, as an individual and as parent and natural guardian of Ari Wilson, Sarah Patterson, Madelyn Patterson and Taren Wilson–Patterson; David Maes, as an individual and as parent and natural guardian of Cherie Maes; Debbie Gould, as an individual and as parent and natural guardian of Hannah Gould, Ben Gould and Daniel Gould; Lillian Leroux, as an individual and natural guardian of Ari Leroux, Lillian Leroux, Ashley Leroux, Alexandria Leroux and Amber Leroux; Theresa Wrangham, as an individual and

natural guardian of Rachel Wrangham and Deanna Wrangham; Alamosa School District, No. RE–11J; Centennial School District No. R–1; Center Consolidated School District No. 26 JT, of the Counties of Saguache and Rio Grande and Alamosa; Creede Consolidated School District No. 1 in the County of Mineral and State of Colorado; Del Norte Consolidated School District No. C–7; Moffat School District No. 2, in the County of Saguache and State of Colorado; Monte Vista School District No. C–8; Mountain Valley School District No. RE 1; North Conejos School District No. RE–1J; Sanford School District No. 6, in the County of Conejos and State of Colorado; Sangre de Cristo School District, No. RE–22J; Sargent School District No. RE–33J; Sierra Grande School District No. R–30; and South Conejos School District No. RE 10, Plaintiffs–Appellants,

v.

STATE of Colorado; Colorado State Board of Education; William J. Moloney, in his official capacity as Commissioner of Education of the State of Colorado; and Bill Ritter, in his official capacity as Governor of the State of Colorado, Defendants–Appellees.

No. 06CA0733.

Colorado Court of Appeals,
Div. IV.

Jan. 24, 2008.

Certiorari Granted Sept. 15, 2008.

Alexander Halpern, LLC, Alexander Halpern, Kathleen J. Gebhardt, Michelle Murphy, Boulder, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, John R. Sleeman, Jr., First Assistant Attorney General, Antony B. Dyl, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees.

Davis Graham & Stubbs, LLP, Kenzo S. Kawanabe, Ryan Lessmann, Denver, Colorado, for Amicus Curiae Great Education Colorado.

Lauren B. Kingsbery, Valerie L. Simons, Denver, Colorado, for Amicus Curiae Colorado Association of School Boards and Colorado Association for School Executives.

Martha R. Houser, Denver, Colorado, for Amicus Curiae Colorado Education Association.

Opinion by Judge WEBB.

This case questions the adequacy of Colorado's school finance system under the state constitution. Plaintiffs, Anthony Lobato, as an individual and as a parent and natural guardian of Taylor and Alexa Lobato, and forty-six other persons in their capacities as taxpayers and parents of children in various Colorado school districts (parents), together with fourteen school districts in the San Luis Valley (school districts), appeal the judgment in favor of defendants, State of Colorado, Colorado State Board of Education, William J. Moloney, in his official capacity as Commissioner of Education of the State of Colorado, and Bill Ritter, in his official capacity as Governor of the State of Colorado, dismissing the complaint for lack of standing and failure to state a claim.

We conclude that as political subdivisions, the school districts lack standing, and that the parents' challenge to the adequacy of school financing is a nonjusticiable political question. Having so concluded, we do not decide whether the parents' claims, if justiciable, are nevertheless precluded by Colorado

Constitution article IX, section 17 (Amendment 23). Therefore, we affirm.

## I. Background

### A. Colorado Constitutional Provisions

Three constitutional provisions are at issue in this case: (1) article IX, section 15 (Local Control Clause); (2) article IX, section 2 (Education Clause); and (3) Amendment 23.

The Local Control Clause states in relevant part: "The general assembly shall ... provide for organization of school districts ... in each of which shall be established a board of education, to consist of three or more directors.... Said directors shall have control of instruction in the public schools of their respective districts."

The Education Clause states in relevant part: "The general assembly shall ... provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously."

Amendment 23 states in relevant part:

(1).... In state fiscal year 2001–2002 through state fiscal year 2010–2011, the statewide base per pupil funding ... for public education ... and total state funding for all categorical programs shall grow annually at least by the rate of inflation plus an additional one percentage point....

(2).... "Categorical programs" include transportation programs, English language proficiency programs, expelled and at-risk student programs, special education programs (including gifted and talented programs), suspended student programs, vocational education programs, small attendance centers, comprehensive health education programs, and other current and future accountable programs specifically identified in statute as a categorical program....

(3).... [T]he general assembly may annually appropriate, and school districts may annually expend, monies from the state education fund created....

(4) (b).... Monies in the state education fund may only be used to comply with subsection (1) [categorical programs] and for accountable education reform, for accountable programs to meet state academic standards, for class size reduction, for expanding technology education, for improving student safety, for expanding the availability of preschool and kindergarten programs, for performance incentives for teachers, for accountability reporting, or for public school building capital construction.

## B. Plaintiffs' Allegations

Plaintiffs alleged that (1) the current school finance system violates the mandate of a "thorough and uniform" public education system under the Education Clause; (2) the General Assembly has enacted education reform legislation imposing state-wide education standards and instructional goals which were established without determining whether sufficient financial resources exist to accomplish those goals; and (3) the school finance system fails to provide sufficient funding to permit school districts either to meet accountability standards and goals, or to provide necessary staffing, services, programs, and facilities to fulfill the goals under federal and state education reform legislation.

Plaintiffs sought a declaration that (1) the Education Clause requires the General Assembly to "provide the financial resources necessary, sufficient, and appropriate to assure that all [school-age children] have an equal opportunity to obtain a constitutionally adequate, quality education"; (2) the school finance system fails to provide funding in an amount and manner to meet the mandate of the Education Clause; and (3) the school finance system violates the rights and authority of the school districts' local boards of education as provided in the Local Control Clause.

They also sought an injunction compelling defendants to design, enact, fund, and implement a school finance system that provides sufficient funding to maintain a thorough and uniform system of free public schools, and prohibiting defendants from further executing and implementing the current school finance system. Finally, they asked the trial court to retain jurisdiction over the matter until defendants have complied.

## C. Defendants' Response

Defendants moved to dismiss under C.R.C.P. 12(b)(1) and 12(b)(5). Defendants asserted that, as political subdivisions, the school districts lacked standing because they cannot challenge statutes directing the performance of their duties; that plaintiffs presented a nonjusticiable political question because the Colorado Constitution commits the determination of educational adequacy to the General Assembly and judicial standards for measuring educational adequacy do not exist; that by adopting Amendment 23, the voters have exercised their constitutional authority to determine the constitutionally required level of state funding; and that the school finance system satisfies Amendment 23. They make the same arguments on appeal.

## D. Trial Court's Judgment

The trial court dismissed plaintiffs' claims without taking evidence. It concluded that the funding levels dictated by Amendment 23 were consistent with the Education Clause; that because the school finance system is in accord with Amendment 23, their claims were nonjusticiable; and that as political subdivisions, the school districts lacked standing. The court did not define the phrase "thorough and uniform" contained within the Education Clause.

## II. Standard of Review

C.R.C.P. 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. *Egle v. City & County of Denver,* 93 P.3d 609, 611 (Colo.App.2004). A court may determine the jurisdictional issue as a matter of law if it accepts all the plaintiff's assertions of fact as true. *Hansen v. Long,* 166 P.3d 248, 250 (Colo.App.2007). On appeal from a dismissal for lack of subject matter jurisdiction, we review a trial court's factual findings for clear error and its legal conclusions de novo. *Egle,* 93 P.3d at 611.

A C.R.C.P. 12(b)(5) motion to dismiss tests the sufficiency of the complaint. *Wagner v. Grange Ins. Ass'n,* 166 P.3d 304, 306 (Colo. App.2007). A reviewing court must "accept all matters of material fact in the complaint as true and view the allegations in the light most favorable to the plaintiff." *Id.* at 306–07 (quoting *BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 71 (Colo.2004)). A C.R.C.P. 12(b)(5) motion should only be granted when "the plaintiff's factual allegations cannot support a claim as a matter of law." *Id.* at 307 (quoting *BRW,* 99 P.3d at 71).

We review such a ruling de novo. *Id.* Notwithstanding the allegations of a complaint, interpretation of a constitutional provision remains a question of law that we also review de novo. *See Bd. of County Comm'rs v. City & County of Broomfield,* 62 P.3d 1086, 1088, 1091 (Colo.App.2002)(motion for judgment on the pleadings).

### III. Standing

■ Standing is a limitation on a court's subject matter jurisdiction that we review de novo. *People in Interest of J.C.S.,* 169 P.3d 240, 243 (Colo.App.2007); *First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC,* 166 P.3d 166, 180 (Colo.App. 2007). It has been described as a component of justiciability. *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 436 (Colo.2000).

■ A plaintiff has standing if (1) the plaintiff suffered an actual injury (2) to a legally protected interest. *Ainscough v. Owens,* 90 P.3d 851, 855 (Colo.2004); *J.C.S.,* 169 P.3d at 245.

■ "A plaintiff satisfies the injury in fact requirement by demonstrating that the activity complained of has caused or has threatened to cause injury to the plaintiff. . . ." *J.C.S.,* 169 P.3d at 245 (quoting *Dunlap v. Colo. Springs Cablevision, Inc.,* 829 P.2d 1286, 1289 (Colo.1992)). The injury-in-fact limitation is necessary under the separation of powers doctrine in the Colorado Constitution. *Ainscough,* 90 P.3d at 856.

■ The legally protected interest requirement presents the question whether the plaintiff has a claim for relief under the constitution, the common law, a statute, a rule, or a regulation. *Id.*

### A. School Districts' Standing

■ The school districts contend the trial court erred when it concluded that, as political subdivisions, they lack standing. We disagree.

■ A political subdivision lacks standing to challenge the constitutionality of a statute concerning its performance. *Denver Ass'n for Retarded Children, Inc. v. Sch. Dist. No. 1,* 188 Colo. 310, 316, 535 P.2d 200, 204 (1975); *Clear Creek Sch. Dist. RE–1 v. Holmes,* 628 P.2d 154, 155 (Colo.App.1981).

■ A school district is a subordinate division of the state, exercising authority to effectuate the state's education purposes. *Holmes,* 628 P.2d at 155; *Bagby v. Sch. Dist. No. 1,* 186 Colo. 428, 435, 528 P.2d 1299, 1302 (1974).

■ An exception to the political subdivision rule is recognized when the constitution or a statute grants a political subdivision express or implied authority to file a civil action against the state. *Romer v. Fountain Sanitation Dist.,* 898 P.2d 37, 40 (Colo.1995); *see also East Grand County Sch. Dist. No. 2 v. Town of Winter Park,* 739 P.2d 862, 865 (Colo.App.1987) (school district had standing to challenge enactment of urban renewal plan because a statute allowed "an affected school district to participate in an advisory capacity with respect to the implementation of tax increment financing in an urban renewal project").

We reject the school districts' assertion that this exception applies because the Local Control Clause vests in them a legally protected interest in controlling instruction in schools, including funding.

■ The Local Control Clause links control over instruction to locally raised funds, not to state funding. *See Owens v. Colorado Congress of Parents, Teachers & Students,* 92 P.3d 933, 943 (Colo.2004) (state program requiring school districts to pay funds from locally raised tax revenues to parents, who then must pay those funds to nonpublic

schools, denied local school districts discretion to allocate locally raised funds under the Local Control Clause); *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1023 (Colo.1982)(Local Control Clause protects school districts against legislative efforts to require them to spend locally raised funds on instruction that the school district does not control); *Belier v. Wilson*, 59 Colo. 96, 98, 147 P. 355, 356 (1915) (taxes raised in one school district cannot be used to fund a school in another district under the Local Control Clause).

Therefore, we conclude that the trial court properly dismissed the school districts for lack of standing because the Local Control Clause does not give them authority to challenge how the General Assembly appropriates state funds to finance education.

#### B. Parents' Standing

■■■■ The jurisdictional nature of standing permits a judicial inquiry, even if lack of standing was not raised by the parties. *Romer v. Bd. of County Comm'rs*, 956 P.2d 566, 586 (Colo.1998); *J.C.S.*, 169 P.3d at 244. We address sua sponte whether the parents have standing, and conclude that they do.

#### 1. Injury–in–Fact

■■■ "To determine whether there is an injury-in-fact, we accept as true the allegations set forth in the complaint." *Ainscough*, 90 P.3d at 857. Parents can sue on behalf of their children. *See Bartlett v. Elgin*, 973 P.2d 694, 697 (Colo.App.1998), *aff'd*, 994 P.2d 411 (Colo.1999).

Here, the parents allege that the cost of educating students in accordance with the Education Clause and education reform legislation exceeds the maximum amount of funding available under the current school finance system, and thus without sufficient financial resources, students do not have adequate access to (1) instructional materials (i.e., textbooks, computers, software, audio-visual equipment, and library books) and (2) programs and services for underserved and at-risk students, gifted and talented students, and non-college bound students.

Accepting these allegations as true, we conclude that inadequate access to public education is an injury-in-fact. *See Ainscough*, 90 P.3d at 856 (Colorado case law provides "broad taxpayer standing in the trial and appellate courts"; standing is conferred when "a plaintiff argues that a governmental action that harms [the plaintiff] is unconstitutional"); *Barber v. Ritter*, 170 P.3d 763, 768 (Colo.App.2007) *(cert. granted* Nov. 13, 2007) ("In cases involving a taxpayer's standing, general allegations of injury are sufficient....").

#### 2. Legally Protected Interest

■■■ An interest is legally protected if the constitution, the common law, a statute, a rule, or a regulation provides the plaintiff with a claim for relief. *Ainscough*, 90 P.3d at 856. This interest may be "having a government that acts within the boundaries of our state constitution." *Id.*

According to the parents, the Education Clause gives children a legally protected interest in a "thorough and uniform" free public school education system that guarantees them "a constitutionally adequate, quality public education." Under the parents' interpretation of the Education Clause, they have identified a legally protected interest at issue. *See Dunlap*, 829 P.2d at 1289 (whether a plaintiff has standing is inextricably tied to the merits of the case); *Wilson v. Prentiss*, 140 P.3d 288, 290 (Colo.App.2006)("Standing is a threshold jurisdictional question that must be determined before a case may be decided on the merits.").

Thus, having subject matter jurisdiction because of the parents' standing, we turn to the political question limitation on justiciability. Because we have concluded that only the parents have standing, the remainder of this opinion is limited to their allegations.

#### IV. Justiciability

■■■ We conclude that the parents' claims are barred by the political question doctrine, but unlike the trial court, we do not rely on Amendment 23.

### A. *Lujan* and Justiciability

Initially, we reject the parents' argument that *Lujan* impliedly establishes claims concerning the quality and level of funding under the Education Clause to be justiciable.

The majority opinion does not mention justiciability. Although the *Lujan* court exercised jurisdiction, "there is a significant difference between determining whether a ... court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'" *Powell v. McCormack*, 395 U.S. 486, 512, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (citing *Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

In *Baker*, the Supreme Court explained the distinction between "lack of federal jurisdiction" and "inappropriateness of subject matter for judicial consideration." *See Nebraska Coalition for Educ. Equity & Adequacy v. Heineman*, 273 Neb. 531, 731 N.W.2d 164, 174–75 (2007). "Unlike the standing doctrine of justiciability, the political question doctrine is not entangled with subject matter jurisdiction." *Id.* at 175 (citing *Powell* and *Baker* )(footnote omitted).

### B. The Majority Rule

The parents assert that the trial court disregarded the "overwhelming majority" of jurisdictions which have held that challenges to their states' school finance systems under the relevant education clauses are justiciable. They cite to *Neeley v. West Orange–Cove Consolidated Independent School District*, 176 S.W.3d 746, 780–81 nn. 182–83 (Tex. 2005), as demonstrating that states addressing this issue are split fifteen to four in their favor.

Based on our review of this authority (see Appendix A), we feel no compulsion to follow the majority rule because of anomalies such as the following:

- The constitutions of Idaho, New Jersey, Pennsylvania, Ohio, West Virginia, and Wyoming include the word "thorough." Of these states, only Pennsylvania has held the funding dispute nonjusticiable. But in New Jersey, West Virginia, and Wyoming, education is a fundamental constitutional right. By contrast, the *Lujan* majority held that "[a] heartfelt recognition and endorsement of the importance of an education does not elevate a public education to a fundamental interest warranting strict scrutiny." 649 P.2d at 1018.

- The constitutions of Arkansas, Florida, Kentucky, and Illinois contain the term "efficient," but not "thorough." These states are evenly split on justiciability.

- Language most consistent with a qualitative guarantee ("high quality") appears in the constitutions of Florida and Illinois, but both states have ruled the funding issue nonjusticiable.

- The constitutions of Massachusetts and New Hampshire contain only very general language ("to cherish the interests of literature and the sciences"), but both states have found justiciability.

- Comparably amorphous language appears in the constitutions of Nebraska ("free instruction in the common schools") and Oklahoma ("a system of free public schools"), but neither state has found justiciability.

In our view, none of these terms has sufficient intrinsic meaning to explain such different resolutions of similar funding claims. We perceive that these diverse outcomes are not based on the constitutional language at issue alone, but often "revolve around policy choices and value determinations." *Heineman*, 731 N.W.2d at 177 (citing *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)).

Instead of dealing with "policy choices and value determinations," we adopt the minority view that such claims raise a nonjusticiable political question because, as discussed in the remainder of this section IV, that view is more consistent with the principle of judicial restraint. *See People v. Summit*, 183 Colo. 421, 426, 517 P.2d 850, 853 (1974)(refusing to strike the statutory classification of marijuana as a narcotic because it was "a matter strictly for the legislature"); *cf. Deriso v. Cooper*, 246 Ga. 540, 272 S.E.2d 274, 277 (1980) (declining to address "the myriad other matter involved in everyday administra-

tion of a public school system which the courts would face were they to embark upon the course of judicial activism desired by the school patrons. Resolution of these discretionary policy determinations can best be made by other branches of government.").

### C. Nonjusticiable Political Question

■ Baker sets forth six independent factors to review in determining whether a nonjusticiable political question has been raised: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; or (2) "a lack of judicially discoverable and manageable standards for resolving it"; or (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; or (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; or (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Vieth v. Jubelirer,* 541 U.S. 267, 277–78, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004)(quoting *Baker,* 369 U.S. at 217, 82 S.Ct. 691); *Meyer v. Lamm,* 846 P.2d 862, 872–73 (Colo.1993).

These factors are "probably listed in descending order of both importance and certainty." *Vieth,* 541 U.S. at 277, 124 S.Ct. 1769. A court should not dismiss a case for lack of justiciability "[u]nless one of these formulations is inextricable from the case at bar." *Baker,* 369 U.S. at 217, 82 S.Ct. 691; *see Schneider v. Kissinger,* 412 F.3d 190, 194 (D.C.Cir.2005)("To find a political question, we need only conclude that one factor is present, not all."). Claims that present a political question must be dismissed. *See* 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3534.3 (2007).

For the following reasons, we conclude that the first through fourth *Baker* factors apply to this case, and therefore we agree with the trial court's dismissal.

### 1. Textually Demonstrable Constitutional Commitment of Issue to Coordinate Political Department

The General Assembly has plenary power to enact legislation, including appropriations. Colo. Const. art. 5, § 32; *Colorado Gen. Assembly v. Owens,* 136 P.3d 262, 266 (Colo. 2006); *Barber,* 170 P.3d at 774. In addition, the Education Clause specifically directs the General Assembly to establish and maintain the system of free public education. Hence, "the fashioning of a constitutional system for financing elementary and secondary public education in Colorado is not only the proper function of the General Assembly, but this function is expressly mandated by the Colorado Constitution." *Lujan,* 649 P.2d at 1024.

### 2. Lack of Judicially Discoverable and Manageable Standards for Resolving Issue

"[L]ack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Nixon v. United States,* 506 U.S. 224, 228–29, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993). Thus, we consider the meaning of "thorough and uniform," on which the parents base their claims, but discern in this language no such "manageable standards" for determining a qualitative educational guarantee, as the parents assert, with which a trial court could measure the constitutional adequacy of funding for education.

Under article VI, section 1 of the Colorado Constitution, the judicial branch is empowered to construe the constitution's meaning. *Bd. of County Comm'rs v. Vail Assocs., Inc.,* 19 P.3d 1263, 1272 (Colo.2001).

■ We afford constitutional language its ordinary and common meaning; where the language is clear, we interpret it as written. *Washington County Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 149 (Colo.2005). We construe constitutional provisions as a whole, giving effect to every word whenever possible. *Id.*

In addressing the meaning of the Education Clause, the parties cite no constitutional history. Nor did the court in *Lujan*

"find any historical background to glean guidance regarding the intention of the framers" regarding the meaning of "thorough and uniform." 649 P.2d at 1024–25.

The Education Clause contains two operative terms: thorough and uniform. "Thorough" is defined as "marked by completeness" and "carried through to completion esp. [sic] with full attention to details." *Webster's Third New International Dictionary* 2380 (2002). "Uniform" is defined as "marked by lack of variation, diversity, change in form, manner, worth, or degree." *Id.* at 2498.

The ordinary meaning of those words does not provide a standard to determine whether there is a qualitative educational guarantee urged by the parents. *See Gresh v. Balink*, 148 P.3d 419, 423 (Colo.App.2006) ("[I]nterpretation cannot solve the lack of clarity or definition in the constitutional provision itself. Instead, that uncertainty is for the General Assembly to elucidate with implementing language or, ultimately, for the voting public to ameliorate by amending the constitutional provision.").

*Lujan* does not support finding such a standard in the term "uniform." Although the *Lujan* court addressed only equal protection under the Education Clause, it determined that a "thorough and uniform" system did not require identical per pupil educational expenditures. 649 P.2d at 1025.

The *Lujan* majority explained that the Education Clause "mandates the General Assembly to provide to each school age child the opportunity to receive a free education, *and to establish guidelines* for a thorough and uniform system of public schools." *Id.* at 1018–19 (emphasis added). The reference to "guidelines" in *Lujan* weighs against interpreting "thorough and uniform" as providing the means to define any such qualitative educational guarantee. *See Webster's Third New International Dictionary* at 1009 ("guideline: ... (c) an indication or outline of future policy or conduct (as of a government)"); *cf. Jaynes v. Centura Health Corp.*, 148 P.3d 241, 249 (Colo.App.2006)(employment performance policy setting forth "guidelines" gave management discretion in dealing with unacceptable employee behavior but did not create an enforceable right).

We are not persuaded otherwise by the parents' reliance on cases such as *Fangman v. Moyers*, 90 Colo. 308, 311–12, 8 P.2d 762, 764 (1932), which merely stand for the proposition that the Education Clause assures all children access to free instruction in public schools. The parents do not assert that the school finance system fails to provide resources essential to free basic instruction. Rather, they argue that the system is unconstitutional because it does not provide "a constitutionally adequate, *quality* public education." (Emphasis added.)

But the contours of a "quality" public education cannot be ascertained by judicially discoverable or manageable standards because the Education Clause "provides no principled basis for a judicial definition." *Comm. for Educ. Rights v. Edgar*, 174 Ill.2d 1, 220 Ill.Dec. 166, 672 N.E.2d 1178, 1191 (1996).

Although the *Edgar* court dealt with constitutional language involving an "efficient system of high quality public educational institutions," such language is less amorphous than "thorough and uniform." Nevertheless, that court explained:

It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise.... Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.

To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois.... In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives.

*Id.; see also Heineman*, 731 N.W.2d at 180 ("We interpret the paucity of standards in the free instruction clause as the framers' intent to commit the determination of adequate school funding solely to the legislature's discretion, greater resources, and expertise.").

Cases from other jurisdictions such as Idaho, New Jersey, Ohio, and Wyoming, which in addressing similar claims have defined "thorough" based on constitutional history and legislative definitions of constitutional language, are inapposite because these extrinsic resources do not exist in Colorado. (See Appendix B.)

Even without such extrinsic resources, some courts have arrived at different definitions of "thorough," and those disparate definitions have had a significant impact on the courts' interpretation of whether a legislative obligation exists to fund a certain level of quality in public education. *Compare Robinson v. Cahill*, 118 N.J.Super. 223, 287 A.2d 187, 211 (Law Div.1972) ("thorough" means "more than simply adequate or minimal"), *modified*, 62 N.J. 473, 303 A.2d 273 (1973), *and Idaho Sch. for Equal Educ. Opportunity v. State*, 132 Idaho 559, 976 P.2d 913, 920 (1998) ("Even without these expressions from the Legislature and the State Board, ... we conclude that a safe environment conducive to learning is inherently a part of a thorough system of public, free common schools ...."), *with Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 877 (W.Va.1979) (a system of schools that "develops, *as best the state of education expertise allows*, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically" (emphasis added)).

We are unable to discern any textual basis for these different definitions. *Cf. Fraternal Order of Police, Colo. Lodge No. 27 v. City & County of Denver*, 926 P.2d 582, 591 (Colo.1996)(noting "direct textual support in the Colorado constitution"). The absence of textual support again suggests that these courts are making policy choices based on value judgments. *See Heineman*, 731 N.W.2d at 177. We do not perceive policy arguments as a sufficient basis for divining

constitutional standards that a trial court could use to assess the adequacy of educational funding.

Nevertheless, the parents assert that declining to find a qualitative educational guarantee in the Education Clause would abrogate the judicial branch's obligation to interpret the constitution. To the contrary, we have considered the meaning of "thorough and uniform," and have concluded that this language does not provide any manageable standard for determining the qualitative guarantee asserted by the parents as a method of assessing adequate funding.

### 3. Impossibility of Deciding Issue Without Making Policy Determinations Requiring Nonjudicial Discretion

 A court must not make or weigh policy. *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.*, 3 P.3d 30, 38 (Colo. 2000); *Concerned Parents of Pueblo, Inc. v. Gilmore*, 47 P.3d 311, 313 (Colo.2002); *see also Martin v. Union Pac. R.R. Co.*, 186 P.3d 61, 68 (Colo.App.2007)("[P]olicy judgments are the exclusive province of the General Assembly.").

The *Lujan* majority recognized that the "best public policy which can be adopted to attain quality school and equal educational opportunity for all children" lies within the General Assembly's domain. 649 P.2d at 1018; *cf. Denver Parents Ass'n v. Denver Bd. of Educ.*, 10 P.3d 662, 665 (Colo.App. 2000) ("Plaintiffs cannot hold a public school district to the implementation of its educational objectives in a judicial setting.... [S]uch policy issues should be addressed at the ballot box, not presented as a judicially enforceable contract claim.").

The *Lujan* majority rejected a "direct correlation between school financing and educational quality and opportunity" as the basis for a decision, explaining that any such correlation involved "the realm of social policy." 649 P.2d at 1018. Because the relationship between school funding and educational quality also requires weighing federal and state mandates under the education reform legislation, school districts' local efforts, and the State's ability to provide funding, courts can-

not "make that determination without deciding matters of educational policy in disregard of the policy and fiscal choices" already made by the General Assembly. *Heineman,* 731 N.W.2d at 183; *see also Edgar,* 220 Ill.Dec. 166, 672 N.E.2d at 1191 ("Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives."); *Oklahoma Educ. Ass'n v. State ex rel. Oklahoma Legislature,* 158 P.3d 1058, 1066 (Okla.2007)("To do as plaintiffs ask would require this court to invade the Legislature's power to determine policy. This we are constitutionally prohibited from doing."); *Marrero v. Commonwealth,* 559 Pa. 14, 739 A.2d 110, 111 (1999)("[I]t would be impossible to resolve the claims without making an initial policy determination of a kind which is clearly of legislative, and not judicial, discretion.").

### 4. Impossibility of Resolving Issue Without Disregarding General Assembly's Authority

Finding and enforcing the parents' standard of a "constitutionally adequate, quality public education" would "present a substantial risk of judicial intrusion into the powers and responsibilities" of the General Assembly. *Coalition for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles,* 680 So.2d 400, 408 (Fla.1996). Determining the changes necessary to the school finance system would require a court to weigh the General Assembly's judgments as to both education reform and financing. Hence, such evaluation of the General Assembly's action or inaction as to school financing "would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature." *Ex parte James,* 836 So.2d 813, 818 (Ala.2002).

Moreover, because of the funding limitations in Colorado Constitution article X, section 20, the Taxpayer's Bill of Rights (TABOR), a judicial requirement of additional school funding could force the General Assembly to reduce general fund appropriations in other areas. Such action would embroil the courts in the appropriation and budgeting process. *Cf. Chiles,* 680 So.2d at 406–07

(refusing to declare that the present school funding level was constitutionally inadequate because "the courts would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them").

### 5. *Baker* Factors (5) and (6)

The remaining *Baker* factors have not been discussed in any Colorado case, nor are they well defined in federal precedent or secondary authority. 13A *Federal Practice and Procedure* § 3534. We decline to address these factors because even one factor is sufficient to find that a political question exists, and we have concluded that the first through fourth factors apply. *See Schneider,* 412 F.3d at 194.

■ In sum, "[d]eciding whether a matter has ... been committed by the Constitution to another branch of government ... is itself a delicate exercise in constitutional interpretation." *Baker,* 369 U.S. at 211, 82 S.Ct. 691. However, "[w]hen a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue" and "acknowledges the possibility that a constitutional provision may not be judicially enforceable." *United States Dep't of Commerce v. Montana,* 503 U.S. 442, 457–58, 112 S.Ct. 1415, 118 L.Ed.2d 87 (1992).

Accordingly, the political question doctrine compels us to reject the parents' invitation to have the trial court determine what level of school financing the General Assembly must provide.

### D. Impossibility of Immediate Resolution

We also feel constrained to resolve any doubt over justiciability of the parents' claims against them because ongoing judicial review of the school finance system under the Education Clause raises the spectre of lengthy and potentially unending litigation. *See Heineman,* 731 N.W.2d at 173 ("A justiciable issue requires a present, substantial controversy between parties having adverse legal interests susceptible to immediate reso-

lution and capable of present judicial enforcement.").

Here, the parents sought injunctive relief, as set forth above, and requested that the trial court retain jurisdiction over the matter until defendants implement and fund a school finance system that meets the Education Clause's alleged qualitative guarantee. Thus, "if the [c]ourt were to declare present funding levels 'inadequate,' presumably the [parents] would expect the [c]ourt to evaluate, and either affirm or set aside, future appropriation decisions...." *Chiles,* 680 So.2d at 407. In such proceedings, "educational philosophy and needs change constantly." *Campbell Cty. Sch. Dist. v. State,* 907 P.2d 1238, 1258 (Wyo.1995).

Despite the parents' request for injunctive relief, their reply brief acknowledges that judicial power is limited "to the extent that a court may not order the legislature 'to convene, consider issues, or enact specific legislation,' *Beauprez v. Avalos,* 42 P.3d 642, 648 (Colo.2002)," and states that the parents "do not ask the court to direct the General Assembly to convene or adopt specific legislation."

The declaratory relief sought by the parents would require the trial court to hear evidence of competing policy choices and prioritize financial resources, a process better suited to legislative inquiry than to judicial fact finding. *Cf. Dean v. District of Columbia,* 653 A.2d 307, 326 (D.C.1995)(Ferren, J., concurring in part and dissenting in part)("[T]here is quite a difference between saying a court should not engage in *any* legislative fact-finding and saying a court should stay away from *particular* legislative fact-finding. The former would be ill-advised and often impossible; the latter, on occasion, may be prudent." (emphasis in original)).

And such a declaration could create an immediate void in educational funding that the General Assembly would be required to remedy with new legislation. Such a scenario would result in an anomalous situation, where, in subsequent judicial proceedings concerning the constitutionality of such new legislation, courts would be constrained either to hold the legislation constitutional or to void it. The latter holding would force the process through yet another cycle.

The Rhode Island Supreme Court pointed out in *City of Pawtucket v. Sundlun,* 662 A.2d 40, 59 (R.I.1995):

[T]he absence of justiciable standards could engage the court in a morass comparable to the decades-long struggle of the Supreme Court of New Jersey.... [The] Court has struggled in its self-appointed role as overseer of education for more than twenty-one years, consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature.

As noted, the New Jersey Supreme Court has struggled for more than two decades to define what constitutes a "thorough and efficient" education under its constitution. *See Abbott v. Burke,* 136 N.J. 444, 643 A.2d 575 (1994); *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359 (1990); *Abbott v. Burke,* 100 N.J. 269, 495 A.2d 376 (1985); *Robinson v. Cahill,* 70 N.J. 464, 79 N.J. 464, 360 A.2d 400 (1976); *Robinson v. Cahill,* 70 N.J. 155, 358 A.2d 457 (1976); *Robinson v. Cahill,* 69 N.J. 449, 355 A.2d 129 (1976); *Robinson v. Cahill,* 69 N.J. 133, 351 A.2d 713 (1975); *Robinson v. Cahill,* 67 N.J. 333, 339 A.2d 193 (1975); *Robinson v. Cahill,* 67 N.J. 35, 335 A.2d 6 (1975); *Robinson v. Cahill,* 63 N.J. 196, 306 A.2d 65 (1973); *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973).

We are cautioned by the experience of other courts that have held such challenges to be justiciable but then been unable to achieve prompt resolution.

The Texas Supreme Court has addressed whether its school finance system is "efficient" under its education clause six times since 1989. *See Neeley v. West Orange–Cove,* 176 S.W.3d 746 (Tex.2005); *West Orange Cove Consol. I.S.D. v. Alanis,* 107 S.W.3d 558 (Tex.2003); *Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717 (Tex. 1995); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826

S.W.2d 489 (Tex.1992); *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491 (Tex. 1991).

Despite "issuing four decisions in this case over the past nine years," the Alabama Supreme Court conceded that "the pronouncement of a specific remedy 'from the bench' would necessarily represent an exercise of the power of that branch of government charged by the people of the State of Alabama with the sole duty to administer state funds to public schools: the Alabama Legislature." *Ex parte James,* 836 So.2d at 816–17.

Therefore, we agree with the Nebraska Supreme Court: "The landscape is littered with courts that have been bogged down in the legal quicksand of continuous litigation and challenges to their states' school funding systems. Unlike those courts, we refuse to wade into that Stygian swamp." *Heineman,* 731 N.W.2d at 183.

Accordingly, we conclude that the parents' claims were properly dismissed as a nonjusticiable political question.

The judgment is affirmed.

Judge CASEBOLT and Judge TERRY concur.

Appendix A

| State | Case Name | Issue/Claim | Constitutional Provision | Justiciable | Reasons | Fundamental Right? |
|---|---|---|---|---|---|---|
| Colorado | | | "The general assembly shall . . . provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state . . . ." Colo. Const. art. IX, § 2. | | | |
| Alabama | *Ex parte James*, 836 So. 2d 813, 817, 819 (Ala. 2002) | Review of an order vacating the trial court's remedy plan requiring the legislature to formulate a constitutional system of school financing. | "The Legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the children thereof between the ages of *seven* and *twenty-one* years." Ala. Const. § 256 (version prior to Amendment 111). | No | While it is the duty of the courts to determine what the constitution requires, "pronouncement of a specific remedy 'from the bench' would necessarily represent an exercise of the power of that branch of government charged by the people of the State of Alabama with the sole duty to administer state funds to public schools: the Alabama Legislature." "[W]e now recognize that any specific remedy that the judiciary could impose would, in order to be effective, necessarily involve a usurpation of that power entrusted exclusively to the Legislature." | |
| Arkansas | *Lake View School No. 25 v. Huckabee*, 91 S.W.3d 472, 484-85 (Ark. 2002) (quoting *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 208-10 (Ky. 1989)). | "[T]hat the current school funding system is unconstitutional under the Education Article and the Equality provisions." | "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education. The specific intention of this amendment is to authorize that in addition to existing constitutional or statutory provisions the General Assembly and/or public school districts may spend public funds for the education of persons over twenty-one (21) years of age, and under six (6) years of age, as may be provided by law, and no other interpretation shall be given to it." Ark. Const. art. XIV, § 1. | Yes | Unlike nonjusticiable states' constitutions which refer to the general assembly, "the Education Article in the Arkansas Constitution designates the *State* as the entity to maintain a general, suitable, and efficient system of free public schools." And it is the sole function of the judiciary "to apply, interpret, define, and construe all words, phrases, sentences and sections of the [Arkansas] Constitution as necessitated by the controversies before it." Further, "This court's refusal to review school funding under our state constitution would be a complete abrogation of our judicial responsibility and would work a severe disservice to the people of this state. We refuse to close our eyes or turn a deaf ear to claims of a dereliction of duty in the field of education." | |

## Appendix A

| State | Case | Provision | Justiciable | Court's reasoning |
|---|---|---|---|---|
| Florida | *Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles*, 680 So. 2d 400, 402, 406-07 (Fla. 1996). | "State has failed to provide its students [the] fundamental right [of education] by failing to allocate adequate resources for a uniform system of free public schools as provided for in the Florida Constitution." | "Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require." Fla. Const. art. IX, 1(a). | No | "To decide such an abstract question of 'adequate' funding, the courts would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them. In short, the Court would have to usurp and oversee the appropriations power, either directly or indirectly, in order to grant the relief sought by Plaintiffs." Thus, "We conclude that here, especially in view of our obligation to respect the separation of powers doctrine, an insufficient showing has been made to justify judicial intrusion." Fla. |
| Idaho | *Idaho Schools for Equal Educational Opportunity, Inc. v. Evans*, 850 P.2d 724, 728, 734 (Idaho 1993) (quoting *Thompson v. Engelking*, 537 P.2d 635, 640 (Idaho 1975)). | "[T]hat the current method of funding the public schools does not provide either a 'uniform' system or a 'thorough' system and, further, violates the equal protection clause." | "The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools." Idaho Const. art. IX, § 1. | Yes | In addressing the "thorough" claim, the court stated: "Mindful that . . . this Court is not well equipped to legislate 'in a turbulent field of social, economic and political policy' . . . we decline to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us. That would be an abject abdication of our role in the American system of government." "Passing on the constitutionality of statutory enactments, even enactment with political overtones, is a fundamental responsibility of the judiciary." Further, "Balancing our constitutional duty to define the meaning of . . . thoroughness . . . with the political difficulties of that task has been made simpler for this Court because the executive branch of the government has already promulgated educational standards." |

Appendix A

| | | | | |
|---|---|---|---|---|
| Illinois | *Lewis E. v. Spagnolo*, 710 N.E.2d 798, 802 (Ill. 1999) (quoting *Committee for Educational Rights v. Edgar*, 672 N.E.2d 1178, 1191 (Ill. 1996)). | "[W]hether the plaintiffs may state a cause of action under the education article of our state constitution." | "The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law." Ill Const. art. X, § 1. | No | "'What constitutes a 'high quality' education cannot be ascertained by any judicially discoverable or manageable standards and that the constitution provides no principled basis for a judicial definition of 'high quality'. 'It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion." |
| Kansas | *Unified School Dist. No. 229 v. State*, 885 P.2d 1170, 1172-73, 1186 (Kan. 1994). | "[P]laintiffs, including unified school districts, taxpayers, and students, challenge the constitutionality of the School District Finance and Quality Performance Act." | "Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards. When authorized by law, such boards may make and carry out agreements for cooperative operation and administration of educational programs under the general supervision of the state board of education, but such agreements shall be subject to limitation, change or termination by the legislature." Kan. Const. art. VI, § 5. AND "The legislature shall make suitable provision for finance of the educational interests of the state." Kan. Const. art. VI, § 6(b). | Yes | "The judiciary interprets, explains, and applies the law to controversies concerning rights, wrongs, duties, and obligations arising under the law and has had imposed upon it the obligations of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people. In this sphere of responsibility, courts have no power to overturn the law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic, or unjust. The remedy in such a case lies with the people through the political process." "It is well settled that courts should not substitute judicial judgment for educational decisions and standards. . . . Hence, the court will not substitute its judgment of what is 'suitable,' but will utilize as a base the standards enunciated by the legislature and the state department of education." |

## Appendix A

| | | | | | | |
|---|---|---|---|---|---|---|
| Kentucky | *Rose v. Council for Better Education, Inc.,* 790 S.W.2d 186, 189, 209 (Ky. 1989) | "[W]hether the Kentucky General Assembly has complied with its constitutional mandate to provide an efficient system of common schools throughout the state." | "The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Ky. Const. § 183. | Yes | "[W]e are asked -- based solely on the evidence in the record before us -- if the present system of common schools in Kentucky is 'efficient' in the constitutional sense. It is our sworn duty, to decide such questions when they are before us by applying the constitution." In contrast, "To allow the General Assembly . . . to decide whether its actions are constitutional is literally unthinkable." | Yes |
| Massachusetts | *McDuffy v. Secretary,* 615 N.E.2d 516, 517, 550, 553, 555 (Mass. 1993) (quoting *Colo v. Treasurer,* 392 N.E.2d 1195, 1197 (Mass. App.Ct. 1979)). | "[T]he State's school-financing system effectively denies them the opportunity to receive an adequate education in the public schools in their communities." | "[I]t shall be the duty of legislatures and magistrates . . . to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of this country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humour, and all social affections, and generous sentiments among the people." Mass. Const. pt. II(C)(5), § 2. | Yes | "If the mandate of the Constitution is not met, or if a statutory structure which worked at one time no longer works, the responsibility for the failure to educate falls squarely on the Commonwealth, specifically the legislatures and magistrates.' They may delegate, but they may not abdicate, their constitutional duty. 'Without in any way attempting to invade the rightful province of the Legislature to conduct its own business, we have the duty . . . to adjudicate a claim that a law and the actions undertaken pursuant to that law conflict with [or fall short of] the requirements of the Constitution.'" The court then articulated "broad guidelines" and assumed "that the Commonwealth will fulfill its duty to remedy the constitutional violations that we have identified." The court noted: "we leave it to the magistrates and the Legislatures to define the precise nature of the task which they face in fulfilling their constitutional duty to educate our children today, and in the future." | Yes |

## Appendix A

| Montana | Columbia Falls Elementary School District No. 6 v. State, 109 P.3d 257, 259-61 (Mont. 2005). | "[T]he State has acted unconstitutionally in administering and funding Montana's constitutionally-mandated public school system." | "[(1)]It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state. (2) The state recognizes the distinct and unique cultural heritage of the American Indians and is committed in its educational goals to the preservation of their cultural integrity. (3) The legislature shall provide a basic system of free quality public elementary and secondary schools. The legislature may provide such other educational institutions, public libraries, and educational programs as it deems desirable. It shall fund and distribute in an equitable manner to the school districts the state's share of the cost of the basic elementary and secondary school system." Mont. Const. art. X, § 1. | Yes | "Since the Public Schools Clause is non-self-executing, it presents a political question which, in the first instance, is directed to the Legislature and is non-justiciable. That determination, however, does not end the inquiry. As here, (1) once the Legislature has acted, or 'executed,' a provision (2) that implicates individual constitutional rights, courts can determine whether that enactment fulfills the Legislature's constitutional responsibility." | Yes: "In this case, the requirement that the Legislature shall provide a basic system of free quality public schools, must be read in conjunction with Section 1 of Article X, which guarantees a right to education." Further, the court noted: "As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right." |

Appendix A

| | | | | | |
|---|---|---|---|---|---|
| Nebraska | *Nebraska Coalition for Educational Equity & Adequacy v. Heineman*, 731 N.W.2d 164, 169, 171, 180, 183 (Neb. 2007). | Plaintiffs "alleged that the funding system does not provide sufficient funds for an 'adequate' and 'quality' education." | "The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years. The Legislature may provide for the education of other persons in educational institutions owned and controlled by the state or a political subdivision thereof." Neb. Const. art. VII, §1. | No | "The Nebraska Constitution commits the issue of providing free instruction to the Legislature and fails to provide judicially discernible and manageable standards for determining what level of public education the Legislature must provide." In discussing the second prong of *Baker*, the court noted that the "people rejected a recent amendment that would have imposed qualitative standards on the Legislature's duty to provide public education." That amendment "would have made a "thorough and efficient education' . . . the 'paramount duty' of the state." The court also noted that the "framers of the 1875 constitution intentionally omitted any language . . . that would have placed restrictions or qualitative standards on the Legislature's duties regarding education" by rejecting the "thorough and efficient" language found in many other states' constitutions. Thus, the court stated, "We interpret the paucity of standards in the free instruction clause as the framers' intent to commit the determination of adequate school funding solely to the Legislature's discretion, greater resources, and expertise." |
| New Hampshire | *Claremont School District v. Governor*, 635 A.2d 1375, 1381 (N.H. 1993) | Does the N.H. Constitution impose a duty on the State to provide constitutionally adequate education? | "Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education through the various parts of the country, being highly conducive to promote this end; it shall be the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of literature and the sciences . . . ." N.H. Const. pt. II, art. 83. | Yes | The court interpreted the Education Clause and determined that there is a duty "that the State provide an education to all its citizens and that it support all public schools." And this duty "extends beyond mere reading, writing and arithmetic. It also includes broad educational opportunities needed in today's society to prepare citizens for their role as participants and as potential competitors in today's marketplace of ideas." However, the court went on to state: "We do not define the parameters of the education mandated by the constitution as that task is, in the first instance, for the legislature and the Governor." And "We are confident that the legislature and the Governor will fulfill their responsibility with respect to defining the specifics of, and the appropriate means to provide through public education, the knowledge and learning essential to the preservation of a free government." |

Appendix A

| State | Case | Claim | Constitutional Provision | Justiciable | Court's Reasoning | Constitutional Right |
|---|---|---|---|---|---|---|
| New Jersey | *Abbott v. Burke*, 693 A.2d 417, 420, 428 (N.J. 1997). | "Plaintiffs contend that recently-enacted legislation, the Comprehensive Educational Improvement and Financing Act of 1996, fails to assure them a thorough and efficient education." | "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4. | Yes | The issue of justiciability was not specifically addressed. However, the court noted that while deference should be given to legislative content and performance standards, it is still the courts' duty "to determine whether the new approach encompassing content and performance standards, together with the constitutional guarantee of a thorough and efficient education for all New Jersey school children. The standards themselves do not ensure any substantive level of achievement." | "Throughout the opinion, the court refers to education as a constitutional right." |
| New York | *Campaign for Fiscal Equity, Inc. v. State*, 655 N.E.2d 661, 665 (N.Y. 1995). | That the State's public school financing system is unconstitutional under the Education Article of the State Constitution and the Equal Protection Clause. | "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const. art. XI, § 1. | Yes | Whether the claim was justiciable was not argued, nor addressed specifically by the court. However, the court noted:"We conclude that a duty exists and that we are responsible for adjudicating the nature of that duty." | |
| North Carolina | *Leandro v. State*, 488 S.E.2d 249, 252-54 (N.C. 1997). | "[T]hat [plaintiffs] have a right to adequate educational opportunities which is being denied them by defendants under the current school funding system." | "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const art. I, § 15. And "The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2(1). | Yes | "When a government action is challenged as unconstitutional, the courts have a duty to determine whether that action exceeds constitutional limits." | "The right to a free public education is explicitly guaranteed by the North Carolina Constitution . . . ." |

Appendix A

| State | Case | Plaintiffs' Claim | Constitutional Provision | | Court's Reasoning | |
|---|---|---|---|---|---|---|
| Ohio | DeRolph v. State, 677 N.E.2d 733, 734, 737 (Ohio 1997). | Plaintiffs sought "a determination that Ohio's system of funding public education is unconstitutional" | "The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State; but, no religious or other sect, or sects, shall ever have any exclusive right to, or control of, any part of the school funds of this state." Ohio Const. art. VI, § 2. | Yes | "Under the long-standing doctrine of judicial review, it is our sworn duty to determine whether the General Assembly has enacted legislation that is constitutional . . . We are aware that the General Assembly has the responsibility to enact legislation and that such legislation is presumptively valid . . . However, this does not mean that we may turn a deaf ear to any challenge to laws passed by the General Assembly. The presumption that laws are constitutional is rebuttable. . . . The judiciary was created as part of a system of checks and balances. We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the General Assembly." | No |
| Oklahoma | *Oklahoma Education Ass'n v. State*, 158 P.3d 1058, 1062, 1066 (Okla. 2007). | "[B]y inadequately funding education [defendants] are . . . depriving Oklahoma school children of a constitutional right to a uniform opportunity to receive a basic, adequate education." | "The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated." Okla. Const. art. XIII, § 1. "Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control; and said schools shall always be conducted in English: Provided, that nothing herein shall preclude the teaching of other languages in said public schools." Okla. Const. art. V, § 1. | No | "The legislature has the exclusive authority to declare the fiscal policy of Oklahoma limited only by constitutional prohibitions. . . . The plaintiffs have failed to provide us with any applicable limitations. The plaintiffs are attempting to circumvent the legislative process by having this Court interfere with and control the Legislature's domain of making fiscal-policy decisions and of setting educational policy by imposing mandates on the Legislature and by continuing to monitor and oversee the Legislature. To do as the plaintiffs ask would require this Court to invade the Legislature's power to determine policy. This we are constitutionally prohibited from doing." | |

Appendix A

| | | | | |
|---|---|---|---|---|
| Pennsylvania | *Marrero v. Commonwealth*, 739 A.2d 110, 111-113 (Pa. 1999). | "[T]hat the General Assembly violated the Pennsylvania Constitution by failing to provide adequate funding for the Philadelphia School District in violation of [the obligation] to 'provide for the maintenance and support of a thorough and efficient system of public education.'" | "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. art. III, § 14. | No | Because of "a lack of judicially manageable standards for resolving the instant claims, . . . it would be impossible to resolve the claims without making an initial policy determination of a kind which is clearly of legislative, and not judicial, discretion." Thus, "Even were this Court to attempt to define the specific components of a 'thorough and efficient education' in a manner which would foresee the needs of the future, the only judicially manageable standard this court could adopt would be the rigid rule that each pupil must receive the same dollar expenditures. . . . [H]owever, . . . expenditures are not the exclusive yardstick of educational quality, or even of educational quantity. . . . The educational product is dependent upon many factors, including the wisdom of the expenditures as well as the efficiency and economy with which available resources are utilized." |
| Rhode Island | *City of Pawtucket v. Sundlun*, 662 A.2d 40, 58-59 (R.I. 1995) (quoting *Hornbeck v. Somerset County Board of Education*, 458 A.2d 758, 790 (R.I. 1983)). | Plaintiffs "sought a declaratory judgment that the state's method of funding public education was violative of the Rhode Island Constitution." | "The diffusion of knowledge, as well as of virtue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools and public libraries, and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education and public library services." R.I. Const. art. XII, § 1. | No | "[P]laintiffs have asked the judicial branch to enforce policies for which there are no judicially manageable standards." "[I]t is not within the power or province of members of the Judiciary to advance their own personal wishes or to implement their own personal notions of fairness under the guise of constitutional interpretation. The quantity and quality of educational opportunities to be made available to the State's public school children is a determination committed to the legislature or to the people . . . through adoption of an appropriate amendment to the State Constitution." |
| South Carolina | *Abbeville County School Dist. v. State*, 515 S.E.2d 535, 537, 540 (S.C. 1999). | "Essentially, they allege that the system is underfunded, resulting in a violation of the state Constitution's education clause. . . ." | "The General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the State and shall establish, organize and support such other public institutions of learning, as may be desirable." S.C. Const. art. XI, § 3. | Yes | Relying on the principle that "It is the duty of this Court to interpret and declare the meaning of the Constitution," the court defined the "minimally adequate education required by our Constitution." Further, the court stated: "We recognize that we are not experts in education, and we do not intend to dictate the programs utilized in our public schools. Instead, we have defined, within deliberately broad parameters, the outlines of the constitution's requirement of minimally adequate education." |

Appendix A

| State | Case | Claim | | Reasoning | Fundamental right? |
|---|---|---|---|---|---|
| Texas | *Neeley v. West Orange-Cove Consolidated Independent School District*, 176 S.W.3d 746, 752, 776-77 (Tx. 2005) | "[T]hat the public school system cannot achieve '[a] general diffusion of knowledge' as required by article VII, section 1 of the Texas Constitution, because the system is underfunded." | "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Tex. Const. art. VII, § 1. | Yes | The Education Clause "imposes on the legislature an affirmative duty to establish and provide for the public free schools." However, this duty "is not committed unconditionally to the legislature's discretion, but instead is accompanied by standards," i.e. "suitable," "essential," and "efficient." Thus, while "the Legislature has the sole right to decide *how* to meet the standards . . . the Judiciary has the final authority to determine *whether* they have been met." | Yes: "all children residing within the State's borders have a "right" to be amply provided with an education. That "right" is constitutionally paramount and must be achieved through a "general and uniform system of public schools." |
| Washington | *Seattle School Dist. No. 1 v. State*, 585 P.2d 71, 80, 84 (Wash. 1978). | "[T]hat the State's reliance on special excess levy funding for discharging its duty to provide for the education of resident children was unconstitutional." | "'It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." Wash. Const. art. IX, § 1. | Yes | "Our review of the record and the briefs compels us to conclude that the Legislature, the Attorney General, school districts and the people of this State are uncertain as to the meaning and application of [the education clause]. They, as well as the impacted public school children, will benefit from a clarification of the applicable constitutional and statutory provisions." And "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." | Yes: "education is a fundamental constitutional right in this State." |
| West Virginia | *Pauley v. Kelly*, 255 S.E.2d 859, 870 (W.Va. 1979). | That the system for financing public schools violates West Virginia Constitution by denying plaintiffs the "thorough and efficient" education required and by denying them equal protection of the law. | "The legislature shall provide, by general law, for a thorough and efficient system of free schools." W. Va. Const. art. XII, § 1. | Yes | After reviewing decisions from other jurisdictions, noting the deference courts give to legislatively promulgated education policies but stating that "these jurisdictions have not hesitated to examine legislative performance of the [constitutional] mandate, and we think properly so, even as they recite that courts are not concerned with the wisdom or policy of the legislation." | Yes: "education is a fundamental constitutional right in this State." |

## Appendix A

| State | Case | Question | Constitutional Provision | Fundamental Right? | Holding | Fundamental Right Quote |
|---|---|---|---|---|---|---|
| Wisconsin | *Vincent v. Voight*, 614 N.W.2d 388, 396 & n.2 (Wis. 2000). | "[W]hether the state school finance system is unconstitutional under . . . the uniformity clause of the education article; and . . . the Equal Protection Clause." | "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours." Wis. Const. art. X, § 3. | Yes | "This court on numerous occasions has interpreted the state constitution to find that assessing the constitutionality of the state school finance system is within its province." And "We are satisfied that the issues presented to us in this case are appropriate for decision by this court in the exercise of our constitutional role. This is an area where all three of the co-equal branches of state government share power and authority consistent with the Wisconsin Constitution. It is indeed 'a delicate exercise in constitutional interpretation.'" | Yes: "We further hold that Wisconsin students have a fundamental right to an equal opportunity for a sound basic education." |
| Wyoming | *Campbell County School District v. State*, 907 P.2d 1238, 1243-44, 1257, 1264 (Wyo. 1995). | "[C]ertain components of the Wyoming public school finance system were unconstitutional under the Equal Protection Section of the Wyoming Constitution . . . and the Education Article of the Wyoming Constitution." | "The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other institutions as may be necessary." Wyo. Const. art. 7, § 1. "The legislature shall make such further provision by taxation or otherwise, as with the income arising from the general school fund will create and maintain a thorough and efficient system of public schools, adequate to the proper instruction of all youth of the state, between the ages of six and twenty-one years . . . ." Wyo. Const. art. 7, § 9. | Yes | "Constitutional provisions imposing an affirmative mandatory duty upon the legislature are judicially enforceable in protecting individual rights, such as educational rights. . . . Although this court has said the judiciary will not encroach into the legislative field of policy making, as the final authority on constitutional questions the judiciary has the constitutional duty to declare unconstitutional that which transgresses the state constitution. . . . When the legislature's transgression is a failure to act, our duty to protect individual rights includes compelling legislative action required by the constitution." | "The fundamental right of education expressly recognized by the Wyoming Constitution . . . ." |

## Appendix B

| State | Case Name | Definition of Thorough |
|---|---|---|
| Idaho | *Idaho Schools for Equal Educational Opportunity v. Evans*, 850 P.2d 724, 734 (Idaho 1993). | "Balancing our constitutional duty to define the meaning of ... thoroughness ... with the political difficulties of that task has been made simpler for this Court because the executive branch of the government has already promulgated educational standards .... We have examined those standards carefully and now hold that, under art. 9, § 1, the requirements for school facilities, instructional programs and textbooks, and transportation systems as contained in those regulations presently in effect, are consistent with our view of thoroughness." |
| Minnesota | *Associated Schools v. School District No. 83*, 142 N.W. 325, 327 (Minn.1913) (quoting Minn. Const. art. 8, § 3 (1857), and *Board of Education v. Moore*, 17 Minn. 412, 416 (1871)). | " '[T]he Legislature shall make such provisions ... as will secure a thorough and efficient system of public schools ....' The object of these provisions is 'to insure a regular method throughout the state, whereby all may be enabled to acquire an education which will fit them to discharge intelligently their duties as citizens of the republic.' " |
| Montana | *McNair v. School District No. 1*, 288 P. 188, 190 (Mont.1930). | "What, then, constitutes a 'thorough' system of education in our public schools? ... [I]t is clear that the solemn mandate of the Constitution is not discharged by the mere training of the mind; mentality without physical well-being does not make for good citizenship—the good citizen, the man or woman who is of the greatest value to the state, is the one whose every faculty is developed and alert." |
| New Jersey | *Abbott v. Burke*, 693 A.2d 417, 425 (N.J.1997). | The legislature promulgated and adopted substantive standards that define a thorough and efficient education: "The substantive requirements are specified by the core curriculum content standards (content standards or standards), and are intended to implement the thoroughness component of the constitutionally mandated thorough and efficient education." The court deferred to these standards. |
| New Jersey | *Robinson v. Cahill*, 287 A.2d 187, 211 (N.J.Super.Ct. Law Div.1972). | "The word 'thorough' in the Education Clause connotes in common meaning the concept of completeness and attention to detail. It means more than simply adequate or minimal." |
| Ohio | *DeRolph v. State*, 677 N.E.2d 733, 741 (Ohio 1997) (quoting *Miller v. Korns*, 140 N.E. 773, 776 (Ohio 1923)). | The Ohio Supreme Court "construed the words 'thorough and efficient' in light of the constitutional debates and history surrounding them." The court stated: "This declaration is made by the people of the state. It calls for the upbuilding of a system of schools throughout the state, and the attainment of efficiency and thoroughness in that system is thus expressly made a purpose, not local, not municipal, but state-wide. With this very purpose in view, regarding the problem as a state-wide problem, the sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools, but a system thorough and efficient throughout the state. A thorough system could not mean one in which part or any number of the school districts of the state were starved for funds. An efficient system could not mean one in which part or any number of the school districts of the state lacked teachers, buildings, or equipment." |
| West Virginia | *Pauley v. Kelly*, 255 S.E.2d 859, 877 (W.Va.1979). | "It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically." |
| Wyoming | *Campbell County School District v. State*, 907 P.2d 1238, 1258–59 (Wyo. 1995). | To define "thorough," the Wyoming Supreme Court relied on (1) statements by its territorial governors; (2) statutes enacted by its legislature setting the framework for defining a proper education; and (3) definitions of the words in the state constitution's clauses set at the time of ratification. The court stated: "[W]e can define 'a thorough and efficient system of public schools adequate to the proper instruction of the state's youth' as an organization forming a network for serving the common purpose of public schools which organization is marked by full detail or complete in all respects and productive without waste and is reasonably sufficient for the appropriate or suitable teaching/education/learning of the state's school age children." |